524 F.2d 609
 UNITED STATES of America, Plaintiff-Appellee,
v.
Martin C. CALAWAY
UNITED STATES of America, Plaintiff-Appellee,
v.
Luigi GELFUSO, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Tony ENDREOLA, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Peter John MILANO, Defendant-Appellant
UNITED STATES of America, Plaintiff-Appellee,
v.
John Joseph VACCARO, Defendant-Appellant.
 Nos. 74-3357, 74-3367, 74-3241, 74-3272 and 75-1255.
 United States Court of Appeals,
Ninth Circuit.
 Oct. 3, 1975.
Rehearing and Rehearing En Banc Denied Nov. 13, 1975.
 
 Clarence Edelson (argued), Los Angeles, Cal., for appellant in 74-3241.
 Richard H. Siegel (argued), Cleveland, Ohio, for appellant in 74-3272.
 Burton Marks (argued), Beverly Hills, Cal., for appellant in 74-3357.
 Dwain Clark (argued), Beverly Hills, Cal., for appellant in 74-3367 & 75-1255.
 James Twitty, Atty., Dept. of Justice (argued), Los Angeles, Cal., for appellee.
 OPINION
 Before BROWNING, DUNIWAY and KILKENNY, Circuit Judges.
 DUNIWAY, Circuit Judges.
 
 
 1
 These are consolidated appeals from judgments of conviction under a three-count indictment charging violations of 18 U.S.C. Sec. 371 (conspiracy to violate 18 U.S.C. Sec. 1955), 18 U.S.C. Sec. 1955 (conducting, financing, managing, supervising, directing or owning an illegal gambling business), and 18 U.S.C. 1952 (interstate travel in aid of racketeering enterprises, i.e., the same gambling business). Defendant Vaccaro was convicted on all three counts. Defendants Milano, Gelfuso, Calaway and Endreola wre convicted only on the first two counts. Except for Endreola, all received concurrent four-year sentences under each count on which they were convicted. Endreola's sentence was two years and a $500.00 fine, both suspended, and three years probation. A variety of contentions are raised on appeal, none of which requires reversal.
 
 
 2
 I. Admissibility of Hearsay Declarations of Conspirators.
 
 
 3
 Gelfuso and Milano argue that evidence of out of court (hearsay) statements by other conspirators, implicating them in the conspiracy, should have been excluded because the other, non-hearsay evidence implicating them is insufficient to permit use of the hearsay statements against them. They do not claim, and could not, on this record claim, that the existence of the charged conspiracy was not proved. Their only argument on this question relates to proof that they were conspirators. That being so, only slight evidence was required to permit a jury to infer, or to support a finding that Milano and Gelfuso were participants in the conspiracy. See, e.g., United States v. Turner, 9 Cir., 1975, 528 F.2d 143 at 162. Also, a conspiracy may be proved by evidence that is entirely circumstantial, and items of circumstantial evidence must be viewed collectively, not in isolation. United States v. Geaney, 2 Cir., 1969, 417 F.2d 1116, 1121. "An otherwise innocent act of 'relatively slight moment,' may, when viewed in the context of surrounding circumstances, justify an inference of complicity...." United States v. Raglan, 2 cir., 1967, 375 F.2d 471, 478 (citation omitted). It is too late to argue that the court erred in provisionally admitting the hearsay statements, subject to later motions to strike or for acquittal, see, e.g., United States v. Turner, supra, 528 F.2d 143 at 162.
 
 
 4
 The test governing admissibility of hearsay statements of coconspirators is whether there is substantial independent evidence, other than hearsay, which is sufficient to support a finding that the conspiracy existed and that the defendant against whom admission is sought was a party to the conspiracy. United States v. Snow, 9 Cir., 1975, 521 F.2d 780 at 733-734; United States v. Spanos, 9 Cir., 1972, 462 F.2d 1012, 1014; Carbo v. United States, 9 Cir., 1963, 314 F.2d 718, 735; Ong Way Jong v. United States, 9 cir., 1957, 245 F.2d 392, 394 & n. 1. All that is required is enough to make a prima facie case; the evidence need not compel a finding beyond a reasonable doubt. Carbo v. United States,supra, 314 F.2d at 737; see United States v. Ledesma, 9 Cir., 1974, 499 F.2d 36, 40; United States v. Randall, 9 Cir., 1974, 491 f.2d 1317, 1319-20; United States v. Griffen, 9 Cir.,1970, 434 F.2d 978, 983-84. Here, we need only consider whether the independent evidence sufficiently shows that Gelfuso and Milano were parties to the conspiracy.
 
 
 5
 In considering this question, we treat testimony by witnesses about statements made by Gelfuso or Milano themselves as part of the independent evidence of their participation in the conspiracy. Such statements by them are not received to establish the truth of what they said, but to show their own verbal acts.[1] A conspiracy is an agreement or understanding, express or implied, between the conspirators. The usual way in which people reach agreements or understandings is by the use of words, oral or written. Indeed, it is difficult to conceive of a conspiracy formed or carried forward without the use of any words. Even sign language and codes are means of verbal communication.
 
 
 6
 The evidence shows that the conspiracy's purpose was to carry on an illegal gambling business in the San Fernando Valley area of Los Angeles. the first instigators were defendant Vaccaro and one Dubeck, an unindicted co-conspirator who (along with his wife) was shot and killed in Las Vegas just before the trial of this case was to begin. Vaccaro and Dubeck came to Los Angeles from Las Vegas and were soon employed to manage a restaurant called Diament's 9000. It was owned in partnership by one Diament, defendant Calaway, an attorney, and perhaps one Ernstsen, the nature of whose interest, if any, is disputed. Vaccaro, Dubeck and Calaway were soon planning to put the restaurant into the gambling business. Vaccaro enlisted the help of one Klytta, the bartender, and, through him, one Coloduros, in obtaining financing. Finally, Vaccaro got Gelfuso into the scheme. Gelfuso persuaded Coloduros first, to store gambling equipment at the house of his late mother, and later to open the business there. Another participant in the scheme was one Deems.
 
 
 7
 Gelfuso and Vaccaro had agreed that Gelfuso and Milano would each get 20% of the profits and Vaccaro 50%. He ran the business. Gelfuso found the site, and was to provide security and collect "markers" (gamblers' I.O.U.'s). He was to share his cut with Dubeck and Calaway. The latter was to provide free legal services if needed. Milano was to provide free bail for persons arrested. When the game was moved out of Coloduros' house Gelfuso arranged it. He received ledger sheets reflecting profits; he and Klytta visited at least one customer to collect a "marker."
 
 
 8
 There was plainly more than enough evidence, exclusive of hearsay, to support a finding that Gelfuso was a participant in the conspiracy. Admission of the hearsay, therefore, was not error. Counsel's argument that certain testimony was "beyond belief" betrays a basic misconception concerning the scope of appellate review. Both the jury and the trial judge were entitled to believe the government's witnesses. Except in unusual or extreme cases, the credibility of testimony is for the fact finder, not for this court.
 
 
 9
 As to Milano, the evidence, if restricted to non-hearsay, was not so strong, but it was sufficient. There was no question that a conspiracy existed; thus, slight evidence was all that was required to establish Milano's complicity. Exclusive of hearsay, the prosecution adduced four principal items of evidence: (1) testimony that Milano attended a large dinner meeting during a period of time in which the principal subject of conversation among most of the others in attendance, on a daily basis, was the Vaccaro-Dubeck-Calaway plan to organize a gambling enterprise; (2) testimony, supported by physical evidence, that Milano participated in the posting of bonds on two occasions for numerous persons arrested when the games were raided and that many of these people never had to pay for the bonds, (8) testimony concerning Milano's conversation with Coloduros in an alley near the bail bond office; (4) Ernstsen's account of a lengthy conversation with Milano at the bail bond office just before the posting of the second round of bail bonds.
 
 
 10
 Standing alone, the fact that Milano attended the dinner meeting proves little. Mere casual association with people who are conspiring is not an offense. There is no testimony about what was discussed at the dinner, much less what Milano said or what others said to him. There was a second meeting that night during which the principal topic was the gambling plan, but Milano had already left. Nonetheless, Milano's presence shows that he was acquainted with the other conspirators even at the very beginnings of the conspiracy.
 
 
 11
 More significant, but still not compelling, is the evidence suggesting that Milano arranged for free bail bonds in accordance with the prearranged scheme for quick release of games employees in the event of arrests. That some of the people released never had to pay for their bonds is suspicious. Bail bondsmen seldom work for free. Still, the evidence that Milano was never paid for his services was far from conclusive: someone else could have paid him, even quite legitimately. But if so, it seems strange that that person's identity was never disclosed and that Milano never called him to testify. Nonetheless, although the circumstances are highly suspicious, Milano's participation in the release is, standing alone, consistent with his contention that he was merely engaging in the legitimate pursuit of his profession. But this evidence does not stand alone.
 
 
 12
 The remaining evidence, not entirely circumstantial, demonstrates that Milano knew of the conspiracy almost from its inception and that in at least one respect he acted to further its objectives. That is all that is required to support a finding of his complicity; from knowledge of the conspiracy and an act in furtherance of it, participation in the illegal agreement may be inferred.
 
 
 13
 On the second weekend of the games' operation, Coloduros told Milano in an alley near the bail bond office that Deems was cheating at the blackjack table and that the customers would eventually notice. Milano did not ask "What are you talking about? or "Who's Deems?" or "What blackjack table?" Instead, his pithy response was "I'll look into it." The inescapable inference is that Milano knew exactly what Coloduros was talking about. The response also suggests that Milano had some interest in or power over the conduct of the games.
 
 
 14
 Equally probative of Milano's knowledge of the conspiracy is the conversation at the bail bond office with Ernstsen. Referring to a newspaper item, Milano stated that the conspirators had not told him "in the front" that they were using crooked dice. From this it may be inferred that the conspirators did have a conversation with Milano "in the front" and that they told him of the gambling, even if not that it was rigged. Milano's next words show that he acted in furtherance of the conspiracy: "Because I'm getting a lot of heat from my friends I sent there." Testimony of prosecution witnesses indicated that one of the gambling operation's early problems was lack of clientele. On several occasions the games had to be cancelled because there were too few players. One of Gelfuso's principal responsibilities was providing customers, and because of initial difficulties Calaway undertook to scare up business as well. That Milano, too, solicited business for the enterprise, when combined with the other evidence that we have outlined, provides and adequate basis for a finding that Milano acted in furtherance of the conspiracy. Thus, admission of coconspirator hearsay, which served to further entwine Milano with the conspiracy, was not error.
 
 
 15
 The cases cited by counsel, which purportedly held strong nonhearsay evidence insufficient, are distinguishable. In Spanos v. United States, 9 Cir., 1972, 462 F.2d 1012, and Ong Way Jong v. United States, 9 Cir., 1957, 245 F.2d 392, the issue was whether a conspiracy existed, not, as here, whether there existed sufficient evidence to connect a defendant to a conspiracy whose existence had already been established. With respect to the latter issue, a lesser quantum of proof is required to support a conviction, and thus to support a conviction, and thus to support a preliminary finding for purposes of the coconspirator exception. In Miller v. United States, 9 Cir., 1967, 382 F.2d 583, there was no evidence that the defendant Joseph had acted in furtherance of the conspiracy. Here the government's evidence showed that Milano did know of the conspiracy. Here the government's evidence showed that Milano did know of the conspiracy. Here the government's evidence showed that Milano did know of the conspiracy and that he acted to further its objectives. In United States v. Cianchetti, 2 Cir., 1963, 315 F.2d 584, there was ample evidence that Cianchetti knew of the conspiracy and that he had on several occasions discussed participating in it with the other conspirators, but all that he ever told them was that "he might be able to help," and after he told them this, the conspirators never heard from him again. Thus, there was no evidence that he ever acted in furtherance of the scheme.
 
 
 16
 Endreola's Appeal.
 
 
 17
 Endreola's principal argument is that the evidence against him was too thin, but his counsel's rambling, disjointed brief does not say whether the target of this argument is the sufficiency of all of the evidence to support the convictions or merely the adequacy of the foundation to support admission of hearsay evidence under the coconspirator exception. In either case, the volley misses the mark.
 
 
 18
 There was nonhearsay testimony (1) that Endreola met Klytta twice at Denny's and Klytta took him to the games, presented him to Vaccaro, and put him to work, telling him how to approve markers and pointing out regular customers, (2) that Klytta saw Vaccaro pay Endreola, (3) that Endreola oversaw the preparation of ledger sheets, and (4) that Klytta would often call him to get an accounting of the night's profits from him. Endreola himself told Klytta that the reason he was present was to protect the interests of Milano. This was more than enough to support admission of the hearsay. Even aside from the hearsay there was sufficient evidence to support Endreola's conviction on both counts.
 
 
 19
 With the exception of those treated infra at Part V, Endreola's other arguments do not warrant discussion.
 
 
 20
 III. Alleged Irregularities in Excusing Prospective Jurors.
 
 
 21
 In lieu of an ordinary panel of veniremen, the trial judge, anticipating difficulties because of pretrial publicity, instructed the jury clerks to assemble all available prospective jurors in his courtroom. The judge did not tell them anything about the case, except that the trial would probably last two to three weeks and that the jury would be sequestered. He then asked anyone who felt that such service would be a personal hardship to pass before the bench for a brief conversation. A number of veniremen were excused. Neither the defendants nor their counsel participated in these proceedings, and the conversations at the bench were not audible to them or recorded by the court reporter. Appellants do not claim that what the court did violates any provision of the Jury Selection and Service Act of 1968, Pub.L. 90-274, 82 Stat. 53, 28 U.S.C. Secs. 1861-1869. They do argue that the procedure violated 28 U.S.C. Sec. 753(b), which requires the recording of "all proceedings in criminal cases had in open court," and Rule 43, F.R.Crim.P., which requires that the defendant be present "at every stage of the trial including the impaneling of the jury." We disagree.
 
 
 22
 The eminently practical procedure employed by the trial judge cannot reasonably be considered a part of the criminal trial. Ordinarily it falls to the jury clerks or commissioners to excuse jurors for hardship, a practice that has been approved by the courts. See, e.g., United States v. Kelly, 2 cir., 1965, 349 F.2d 720, 778-79; United States v. Woodner, 2 Cir., 1963, 317 F.2d 649, 651; United States v. Flynn, 2 Cir., 1954, 216 F.2d 354, 386-88. Surely the fact that this time the excusing was done by a judge sitting in his courtroom does not alter the essential nature of what was done, cf. 28 U.S.C. Sec. 1866(c)(1). We note especially the strikingly similar facts of Woodner, supra, in which the Second Circuit failed to detect "the remotest possibility of prejudicial error" in a procedure whereby the trial judge heard hardship excuses, unrecorded, within the sight of but beyond earshot of the defendants and their counsel.
 
 
 23
 IV. Promises to Prosecution Witnesses.
 
 
 24
 Anticipating impeachment by the defense, the prosecutor, on direct examination, asked two of its witnesses, Ernstsen and Coloduros, whether there were any charges pending against them and whether any promises had been made in exchange for their testimony. Coloduros responded to relocate him and give him a new identity. Ernstsen's answer was as follows:
 
 
 25
 You told me that the only promise you would make to me is that after this trial was over and as long as I was in the custody of the United States Government you would see that I was kept alive.
 
 
 26
 Each of these answers prompted defense motions for a mistrial, which the trial judge denied. On appeal only Vaccaro and Gelfuso urge that the motions should have been granted.
 
 
 27
 Both answers were potentially prejudicial. Precautions inexorably suggest danger, and it would have been natural for a juror to conclude that it was the defendants who were a danger to these witnesses' safety. The government has acknowledged that Coloduros' answer was known to the prosecution in advance. That being so, the question may have been improper. It would have been better to leave it to defense counsel to make the difficult tactical decision whether to risk a potentially prejudicial answer in quest of impeachment. Defense counsel might well have chosen to forego the impeachment effort which the prosecution was anticipating.
 
 
 28
 Ernstsen's answer was apparently a surprise. The answer the prosecutor expected concerned a promise to disclose Ernstsen's cooperation to any judge before whom he might appear for sentencing. An affidavit by the prosecutor recites that Ernstsen was specifically instructed to say nothing about the threats to his safety. Despite the possibility of prejudice, we find no reversible error. The lengthy record discloses overwhelming evidence that Vaccaro and Gelfuso were guilty. As to them, the prosecution's misconduct, if any, was harmless.
 
 
 29
 V. 18 U.S.C. Sec. 1955.
 
 
 30
 Appellants argue that Wharton's Rule bars separate convictions for conspiracy under 18 U.S.C. Sec. 371 and for violations of 18 U.S.C. Sec. 1955. they are wrong. Iannelli v. United States, 1975, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616. Nor does Iannelli bar separate convictions of "lesser participants" such as Endreola; the opinion unequivocally states that the decision to seek dual convictions is committed to the sound discretion of the prosecutor. See 420 U.S. at 791, 95 S.Ct. 1284. Finally, there was more than enough evidence, even exclusive of that implicating Milano, from which the jury could conclude that the "illegal gambling business" was conducted by five or more persons, as required by 18 U.S.C. Sec. 1955(b)(1)(ii). What is required is that five or more persons be involved, not that five or more persons be indicted or convicted. Congress clearly meant to count all persons employed in the gambling business, not just those acting in a supervisory capacity. United States v. Sacco, 9 Cir. in banc, 1974, 491 F.2d 995, 1002-03; United States v. Meese, 8 Cir., 1973, 479 F.2d 41, 43; United States v. Hunter, 7 Cir., 1973, 478 F.3d 1019, 1021-22; United States v. Harris, 5 cir., 1972, 460 F.2d 1041, 1049-50; United States v. Riehl, 3 cir., 1972, 460 F.2d 454, 459.
 
 
 31
 The judgments of conviction are affirmed.
 
 
 
 [1]
 See Federal Rules of Evidence, Rule 801 (c), which defines hearsay as "a statement ... offered in evidence to prove the truth of the matter asserted," and the Advisory Committee's Not to Subdivision (c):
 Subdivision (c). The definition follows along familiar lines in including only statements offered to prove the truth of the matter asserted. McCormick Sec. 225; 5 Wigmore Sec. 1361, 6 id. Sec. 1766. If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay .... The effect is to exclude from hearsay the entire category of "verbal acts" and "verbal parts of an act," in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights. Fed.Rules of Evid.Ann., 95, FEd.Judicial Center, 1975.
 See also Creaghe v. Iowa Home Mutual Casualty Co., 10 Cir., 1963, 323 F.2d 981, 984-5 and cases cited; Safeway Stores, Inc. v. Combs, 5 Cir., 1960, 273 F.2d 295, 296; Aikins v. United States, 10 Cir., 1960, 282 F.2d 53, 57.