**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Inocenio Guterrez PEREZ, aka Jose Perez, and Jose De Jesus Ruvalcaba-Villalobos, Defendants-Appellants.**

**No. 80–1320.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 12, 1981.

Decided June 29, 1981.

As Amended Sept. 28, 1981.

Jerome S. Stanley, Stanley & Wing, Inc., Sacramento, Cal., defendants-appellants.

Julian Macias, Asst. U. S. Atty., Sacramento, Cal., for plaintiff-appellee.

Before TANG and POOLE, Circuit Judges, and LUCAS *, District Judge.

TANG, Circuit Judge:

## I

Appellant Ruvalcaba-Villalobos was convicted of conspiracy to distribute cocaine and distribution of cocaine. On appeal he contends: (1) there was insufficient evidence of conspiracy and his connection to it to justify the admission of certain statements under the coconspirator exception to the federal hearsay rules; (2) his Sixth Amendment right to confront witnesses was violated by the admission of the coconspirator's statements; (3) the trial court erred in dismissing a juror; and (4) the trial court erred in sentencing him to a special parole term in connection with his conspiracy conviction under 21 U.S.C. § 846. Our review indicates that the district court must be affirmed on the first three issues. Because the Supreme Court recently ruled that a special parole term may not be imposed in connection with conspiracy conviction under 21 U.S.C. § 846, however, the district court's sentence must be vacated to the extent that it contains such a term.

* Honorable Malcolm M. Lucas, United States District Judge for the Central District of California, sitting by designation.

## II

On November 26, 1979, a government informer, Catalino Nunez, met with Jose Perez for the purpose of negotiating a drug sale. Perez had told Nunez that he could sell him large quantities of drugs. In order to maintain contact, Nunez and Perez exchanged phone numbers. After this first meeting Nunez contacted Special Agent Cazares of the Drug Enforcement Administration.

A second meeting was arranged and on November 27, 1979, Cazares and Nunez met with Perez at the Stockton Holiday Inn. At this meeting, Perez told Cazares and Nunez that he could get one or two kilograms of cocaine from his brother-in-law, Ruvalcaba-Villalobos (Ruvalcaba), to sell to Nunez and Cazares. Perez also stated that he had five ounces of heroin that he had received from Ruvalcaba. Cazares agreed to buy it. Perez left the hotel and returned shortly thereafter and gave the heroin to Cazares with the understanding that Cazares would pay for it at a later meeting. The three men met for a third time on November 29, 1979, when Cazares paid Perez $800.00 for the heroin he had previously obtained.

At a fourth meeting between Nunez and Perez on December 8, 1979, Perez told Nunez that he had traveled to Los Angeles to procure more heroin to sell to Nunez and Cazares. The heroin was not of good quality so Perez did not transport it from Los Angeles. He arranged instead with Ruvalcaba and a Peruvian party named Alvarez-Yanez to have available two kilograms of cocaine for sale.

At a fifth meeting involving Perez, Cazares and Nunez on December 10, 1979, Cazares and Nunez decided to forego traveling to Los Angeles to obtain the cocaine. Perez suggested that he could call Los Angeles to see if his source of supply—Ruvalcaba and Alvarez-Yanez—would be able to transport the drug to Stockton. Perez informed Cazares and Nunez that the price would be higher in that event. The parties agreed that the price for the transported cocaine would be $2,200.00 per ounce. At that point, the parties went to the Perez apartment in order to phone his brother-in-law, Ruvalcaba, and arrange for transportation of the cocaine to Stockton for sale to Cazares and Perez.

Perez placed the call. He indicated initially that he was speaking with his sister, Amelia. Cazares then spoke to Amelia and explained that he would pay an additional $200.00 per ounce for the cocaine if it could be brought up to Stockton. Apparently Ruvalcaba, identifying himself as Jesus, then came to the telephone and Perez took the receiver and explained the arrangement. Cazares spoke next and Ruvalcaba explained to him that he would have to get permission from the owner of the drug in order to transport the cocaine to Stockton. The telephone call terminated and Ruvalcaba returned the call shortly thereafter. He apparently indicated to Perez that he had been unable to contact the owner of the cocaine. Immediately after that call, Perez gave Ruvalcaba's name, address and telephone number to Cazares for the purpose of contact should the deal have to be transacted in Los Angeles.

On December 11, 1979, Cazares spoke with Perez by telephone. Perez informed Cazares that Ruvalcaba had agreed to bring the cocaine to Stockton and would arrive that evening. On December 12th, Perez informed Cazares by telephone that Ruvalcaba had arrived with the cocaine. Ruvalcaba spoke with Cazares during the same call and confirmed the information. Later that afternoon Perez met with Cazares and Nunez to exchange the cocaine. After Cazares received the cocaine from Perez, he field tested it and determined that it was in fact cocaine. Perez indicated that Ruvalcaba and Alvarez-Yanez were at his apartment and that he would make the payment at the grocery store where he worked. Subsequently, Perez, Alvarez-Yanez and Ruvalcaba were arrested. Cazares recognized Ruvalcaba's voice and identified him as the individual he had spoken with over the telephone.

Ruvalcaba was tried before a jury and found guilty of conspiring to distribute co-

caine, 21 U.S.C. § 846 (1976), and of distributing cocaine, 21 U.S.C. § 841 (1976). He received two sentences of twelve years in prison for each count, the sentences to run concurrently. Additionally, a special parole term of five years was imposed for each count.

### III

Defendant Ruvalcaba first argues that because there was insufficient evidence of the conspiracy and his link to it, the district court erred in admitting oral statements made by Perez under the coconspirator exception of the federal rules of evidence.[1] *See generally* Fed.R.Evid. 801(d)(2)(E). We affirm the district court's ruling.

The statements at issue were made by Perez in the presence of Cazares and Nunez on November 27 and 29, December 8, 10, 11 and 12. The statements directly implicated Ruvalcaba. Ruvalcaba also objected on the same basis to the admission of statements by Alvarez-Yanez. The admissibility of the statements was argued prior to the defendants' trial.[2] At that point, the court ruled that the statements could be admitted, subject to a mistrial should the prosecution fail to lay a proper foundation. Ruvalcaba argues that the trial court erred in admitting the testimony because the only evidence establishing the conspiracy and linking him to it consisted of Perez' statements and his own. The government argues that ample evidence supports the lower court's ruling.

Federal Rule of Evidence 801(d)(2)(E) requires proof of three elements: (1) that the declaration be in furtherance of the conspiracy; (2) that the declaration be made during the course of the conspiracy; and (3) that there is independent proof of the existence of the conspiracy and of the connection of the declar-

ant and the defendant with it. *See Carbo v. United States*, 314 F.2d 718, 735 n.21 (9th Cir. 1963), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). Preliminary questions of fact determinative of the admissibility of evidence challenged under this hearsay exception are resolved by the judge, not the jury. *Id.* at 736–37; *United States v. King*, 552 F.2d 833, 848–49 (9th Cir. 1976), *cert. denied*, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). In order to prove the existence of conspiracy under the third prong of the coconspirator exception, the prosecution must establish a *prima facie* case through the introduction of substantial independent evidence other than the contested hearsay. The evidence need not compel a finding of conspiracy beyond a reasonable doubt. *United States v. Dixon*, 562 F.2d 1138, 1141 (9th Cir. 1977), *cert. denied*, 435 U.S. 927, 98 S.Ct. 1494, 55 L.Ed.2d 521 (1978); *United States v. Calaway*, 524 F.2d 609, 612 (9th Cir. 1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 733 (1976). Circumstantial evidence is often sufficient to establish the existence of a conspiracy. *United States v. Weaver*, 594 F.2d 1272, 1274 (9th Cir. 1979). Once the conspiracy has been proven under these standards, only "slight evidence" is necessary to connect a coconspirator to the conspiracy. *Id.* This requirement of "slight evidence", however, does not eliminate the government's burden of introducing the minimal quantum of proof necessary to prove the connection. *See United States v. Peterson*, 549 F.2d 654, 657 (9th Cir. 1977). There is no immutable order of proof. The contested statements may be admitted conditionally as long as the court in the proper exercise of its discretion determines that a motion to strike could cure defects resulting from insufficient proof of the necessary preliminary facts. *See Unit-*

---

1. Federal Rule of Evidence 801(d)(2)(E) provides in part: "[A] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

2. Unlike the Fifth Circuit, this court has declined to express a "preference" for pretrial

determination of admissibility of the coconspirator's statements. *Compare United States v. Zemek*, 634 F.2d 1159, 1169–1170 (9th Cir. 1980), *with United States v. James*, 576 F.2d 1121 (5th Cir. 1978), *modified en banc*, 590 F.2d 575 (5th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979).

*ed States v. Watkins*, 600 F.2d 201, 204 (9th Cir.), *cert. denied*, 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979).

▪ In this case there is abundant evidence other than the coconspirators' statements independently establishing the existence of the conspiracy. The defendant's telephone conversations with Cazares on December 10 and December 12 constitute admissions to the conspiracy under Federal Rule of Evidence 801(d)(2)(A). Ruvalcaba's return call on December 10 and Perez' verbal conduct indicating that he was speaking with Ruvalcaba were witnessed by Cazares and Nunez. Ruvalcaba's call was admissible as either an admission under Federal Rule of Evidence 801(d)(2)(A) or as nonassertive conduct under Federal Rule of Evidence 801(a), (c).[3] Perez' verbal conduct acknowledging that the caller was Ruvalcaba, whether express or implied, was an implied assertion and admissible as nonassertive conduct under Federal Rule of Evidence 801(a), (c).[4] Consequently, either Cazares or Nunez could properly testify to the call and Perez' acknowledgment over a double-hearsay objection.

▪ Ruvalcaba also contends that the use of his own statements to infer the presence of a conspiracy is nothing more than judicial bootstrapping. Specifically, Ruvalcaba

contends that Cazares' testimony regarding statements made during their telephone conversation on December 10 was improperly admitted. This argument misses the mark because the defendant's own statements are admissions wholly apart from the coconspirator exception and as such are admissible as nonhearsay. This court has previously recognized this principle and has validated the use of admissions as evidence of conspiracy. *See United States v. Cawley*, 630 F.2d 1345, 1350 (9th Cir. 1980); *United States v. Weiner*, 578 F.2d 757, 770–71 (9th Cir.), *cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978); *cf. Calaway*, 524 F.2d at 612 (defendant's statements admitted as verbal acts under rule 801(c)).

Although the foregoing evidence would be sufficient to establish the conspiracy, other probative evidence was properly admitted. The prosecution presented evidence of meetings for the purpose of exchanging cocaine and evidence of the actual exchange of and payment for the cocaine. Such evidence is substantial. *See United States v. Testa*, 548 F.2d 847, 854 (9th Cir. 1977).

▪ Substantial independent evidence also supports the district court's conclusion that Ruvalcaba was linked to the conspiracy. Ruvalcaba's admissions of De-

**3.** *See Lubbock Feed Lots, Inc. v. Iowa Beef Processors*, 630 F.2d 250, 263 (5th Cir. 1980) (testimony that declarant received several phone calls a day probative of fact to be proved rather than any direct statement by declarant); *United States v. Lobo*, 516 F.2d 883, 884 n. 1 (2d Cir.), *cert. denied*, 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975) (while flight may be viewed as an admission and therefore not hearsay "[p]referably it is to be viewed as conduct offered as circumstantial evidence rather than for its assertive, testimonial value".); Falknor, *Hearsay*, 1969 Law & Soc. Order 591, 594 n. 15 ("we are concerned here with non-assertive conduct, thus, the problem has to do with an 'implied', not an 'express assertion'. In other words, we assume that the declarant has not expressly asserted the fact that the evidence is offered to prove; its relevancy rests on a purely circumstantial basis.").

**4.** Nonassertive conduct is admissible whether it is verbal or nonverbal:

The situations giving rise to the nonverbal conduct are such as virtually to eliminate

questions of sincerity. Motivation, the nature of the conduct, and the presence or absence of reliance will bear heavily upon the weight to be given the evidence. Similar considerations govern nonassertive verbal conduct and verbal conduct which is assertive but offered as a basis for inferring something other than the matter asserted . . . . Fed.R.Evid. 801(a) note (citation omitted). *See United States v. James*, 576 F.2d at 1129 (messages sent by one FBI agent to another that extortioners' call had begun and ceased were not hearsay when only used to demonstrate that messages received were in fact sent by other FBI agent); *cf. United States v. Day*, 591 F.2d 861, 884 & n. 44 (D.C. Cir. 1978) (note bearing defendant's name found on coconspirator is nonhearsay) (collecting similar cases); *United States v. Snow*, 517 F.2d 441, 443–44 (9th Cir. 1975) (name tag bearing defendant's name affixed to machine gun case treated as circumstantial evidence only and nonhearsay).

cember 10 and 12, together with the nonassertive conduct of December 10, prove the critical nexus with the conspiracy. *See United States v. Zemek,* 634 F.2d 1159 (9th Cir. 1980); *Weiner,* 578 F.2d at 770–71; *Testa,* 548 F.2d at 854 (9th Cir. 1977); *United States v. Calaway,* 524 F.2d at 612. The fact that a phone call was placed by Perez to the defendant was also proper evidence of nonassertive conduct and is nonhearsay. Additionally, although mere presence near the scene of illicit activity is never enough to infer a nexus to the conspiracy, *see Weaver,* 594 F.2d at 1273, Ruvalcaba's presence in Stockton is probative of the nexus when viewed in context with the other independent evidence just recounted. *See e. g., United States v. Fried,* 576 F.2d 787, 789 (9th Cir.), *cert. denied,* 439 U.S. 895, 99 S.Ct. 255, 58 L.Ed.2d 241 (1978); *Dixon,* 562 F.2d 1142–43; *Testa,* 548 F.2d at 854.

## IV

Ruvalcaba's second contention is that the trial court erred in admitting the statements of Perez and Alvarez-Yanez through the testimony of Cazares and Nunez because the defendant was denied his constitutional right to confront and cross-examine his accusers—the absent coconspirator declarants. Examined under the appropriate standards, however, the defendant's constitutional argument cannot be sustained.

 The Sixth Amendment to the United States Constitution provides, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ...." Although the hearsay rules and the confrontation clause promote similar values, admissibility

under a hearsay exception does not *a fortiori* dissolve the court's obligation to review the record for constitutional infirmity. *Dutton v. Evans,* 400 U.S. 74, 86, 91 S.Ct. 210, 218, 27 L.Ed.2d 213 (1970). This principle has particular force when the admission of evidence is sought under the coconspirator exception: Admission under the coconspirator exception does not automatically guarantee compliance with the confrontation clause. *See United States v. Snow,* 521 F.2d 730, 735 (9th Cir. 1975), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976); *United States v. Baxter,* 492 F.2d 150, 177 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974).[5] Although the right to cross-examine is not absolute, *see United States v. Gay,* 567 F.2d 916, 919 (9th Cir.), *cert. denied,* 435 U.S. 999, 98 S.Ct. 1655, 56 L.E.2d 90 (1978), the introduction of evidence under the coconspirator exception without more is insufficient to satisfy constitutional requirements.

The Supreme Court has refused to provide an exhaustive standard that could be expected to resolve all possible fact situations or test the adequacy of every exception, *see California v. Green,* 399 U.S. 149, 162, 90 S.Ct. 1930, 1937, 26 L.Ed.2d 489 (1970), but it has recently announced that confrontation clause analysis should proceed case-by-case under a two-track approach that tests the necessity and reliability of the contested testimony. *Ohio v. Roberts,* 448 U.S. 56, 65–66, 100 S.Ct. 2531, 2538–2539, 65 L.Ed.2d 597 (1980):

> The Confrontation Clause operates in two separate ways to restrict the range of admissible hearsay. First, in conformance with the Framers' preference for

---

5. The Supreme Court has found that dying declarations and cross-examined prior trial testimony "rest upon such solid foundations that admission of virtually any evidence within them comports with the 'substance of the constitutional protection'." *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980), *quoting Mattox v. United States,* 156 U.S. 237, 244, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895). Because the Court failed to equate the coconspirator exception with dying declarations or cross-examined prior trial testimony

and because the coconspirator exception does not bear the same degree of either necessity or reliability arguably present with these latter exceptions, we reaffirm our disapproval of the First Circuit's assertion in *Ottomano v. United States,* 468 F.2d 269, 271 (1st Cir. 1972), *cert. denied,* 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 (1973), that mere satisfaction of requirements for the coconspirator exception automatically meets all possible confrontation clause infirmities. *See United States v. Snow,* 521 F.2d at 734.

face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case (including cases where prior cross-examination has occurred), the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant.

The second aspect operates once a witness is shown to be unavailable. Reflecting its underlying purpose to augment accuracy in the fact-finding process by ensuring the defendant an effective means to test adverse evidence, the clause countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.'

*Id.* at 65, 100 S.Ct. at 2538–39 (citations and footnotes omitted).

The Court has specifically rejected any suggestion that the "necessity" be "absolute": The prosecution is not required to produce a seemingly available witness when the "utility of trial confrontation is remote". *Id.* at 65, n. 7, 100 S.Ct. at 2538 n. 7. Testimony that is neither "crucial" to the prosecution nor "devastating" to the defendant might not be subject to the necessity requirement. *See Dutton,* 400, U.S. at 87, 89, 91 S.Ct. at 219, 220.

■■■ Although not purporting to enumerate all potentially relevant factors, the Court in *Dutton* tested the reliability of a coconspirator's statements under four indicia: (1) whether the declaration contained assertions of past fact; (2) whether the declarant had personal knowledge of the identity and role of the participants in the crime; (3) whether it was possible that the declarant was relying upon faulty recollec-

tion; and (4) whether the circumstances under which the statements were made provided reason to believe that the declarant had misrepresented the defendant's involvement in the crime.[6] *Dutton,* 400 U.S. at 88–89, 91 S.Ct. at 219–220. All four elements need not be present in order to satisfy the confrontation clause. In some circumstances, a statement may be admitted over confrontation clause objections even if it does not pass scrutiny under each prong of the *Dutton* test. *See Snow,* 521 F.2d at 734–35.

Along with his motion to continue, Ruvalcaba submitted Perez' affidavit which alleged that Perez would testify on the defendant's behalf at trial. Perez had earlier pled guilty to the crimes of distributing cocaine and carrying a firearm. The court denied the motion and admitted the statements of Perez and Alvarez-Yanez at the trial. Ruvalcaba does not mount a challenge based on the "necessity" prong of *Roberts*; rather, he contends that admission of the statements was not justified by "indicia of reliability".

■■■ Tested under *Dutton's* reliability factors, the defendant's contention is weak. The principal declarations at issue were telephone conversations between Perez and the defendant in which an ongoing activity—the prospective drug transaction—was discussed. The contested declarations were not of past fact so there was little risk that a jury could give undue weight to the statements. *See Dutton,* 400 U.S. at 88–89, 91 S.Ct. at 219–220. It is also clear that the declarant, Perez, had personal knowledge of the identity of the participants: The defendant was known intimately by Perez because they were brothers-in-law who had conducted transactions in the past. *See id.*

**6.** In *United States v. Nick,* 604 F.2d 1199, 1203 (9th Cir. 1979) (per curiam), this court suggested that Fed.R.Evid. 803(24) might be used as a "useful set of criteria" in testing reliability for confrontation clause purposes. *Nick,* however, announced this new standard without any justification. Upon first impression, *Nick* seems to depart from the standards announced in *Dutton.* Indeed, although Fed.R.Evid. 803(24) requires that the statement be "more probative on the point for which it is offered than any other evidence which the proponent can pro-

cure through reasonable efforts", the *Dutton* standard contains no such requirement. The *Nick* court implicitly recognized as much when it refused to apply that prong of the rule 803(24) standard literally. *See id.* at 1204 (admitting that other evidence was more probative than the contested declaration). We can only conclude, therefore, that the court in *Nick* utilized rule 803(24) as a convenient supplementary guidepost to confrontation clause analysis without promulgating it as a test of general application.

Moreover, because the declarations concerned an ongoing or prospective activity, there was no risk that Perez was relying on faulty memory. *See id.* Finally, the circumstances under which the statements were made indicate that Perez had little to gain through misrepresenting the defendant's involvement in the crime. *See id.* When made, the statements were clearly contrary to Perez' penal interests and, under the circumstances, we find unpersuasive the defendant's contentions that Perez misrepresented the defendant's role merely to enhance the value of the drugs or to avoid a rip-off. Nor do the circumstances indicate that Perez was boasting about the availability of the drugs. Furthermore, the fact that Perez offered to testify on the defendant's behalf is of little probative force because Perez had already pled guilty and his prospective testimony could not be used against him. Ruvalcaba cannot argue that Perez' testimony would have been contrary to his penal interests.

Although the precise function of the characterization of the contested testimony as either "crucial" or "devastating" is unclear,[7] the testimony admitted here was neither crucial to the prosecution nor devastating to the defendant. Indeed, the testimony simply corroborated the other evidence offered at trial; the defendant's own statements, proof of the meetings between Perez, Cazares and Nunez, the phone calls to the defendant, the fact that Perez gave Cazares the name, address, and phone number and the defendant's presence in Stockton on the date of the arrests. We have previously found that such corroboration may properly support a determination that the testimony was reliable. *See United States v. Rosales,* 606 F.2d 888, 889 (9th Cir. 1979); *Snow,* 521 F.2d at 734.

### V

Ruvalcaba also argues that the lower court erred in dismissing juror Dorothy Kim. Because the record establishes that

the court did not abuse its discretion in dismissing the juror, we reject the contention and affirm the district court.

Immediately after the government's redirect examination of Nunez, the following exchange occurred:

DOROTHY KIM (JUROR NO. 8): Your Honor, is it proper to ask the interpreter a question? I'm uncertain about the word La Vado. You say that is a bar.

THE COURT: The Court cannot permit jurors to ask questions directly. If you want to phrase your question to me—

DOROTHY KIM: I understood it to be a restroom. I could better believe they would meet in a restroom rather than a public bar if he is undercover.

THE COURT: These are matters for you to consider. If you have any misunderstanding of what the witness testified to, tell the Court now what you didn't understand and we'll place the—

DOROTHY KIM: I understand the word La Vado—I thought it meant restroom. She translates it as bar.

MS. IANZITI: In the first place, the jurors are not to listen to the Spanish but to the English. I am a certified court interpreter.

DOROTHY KIM: You're an idiot.

Although later admitting that he did not hear Kim's precise words, the trial judge quickly responded to the outburst:

Just a moment. The Court recognizes that some of the jurors may be able to understand Spanish, and your own ears will tell you what you hear. This witness is testifying through an interpreter, but if those of you who can in fact understand Spanish hear certain words differently that you understand the interpreter to relate them, then you may, when the witness is finished with his testimony, you may place your question, you may raise the question that you have with the Court. If the Court feels that it is a question that can be properly answered,

---

**7.** Although it is uncertain whether the "crucial" or "devastating" nature of the contested declaration is a separate and discreet aspect of the test of reliability or merely a summation of the four *Dutton* factors, it is apparent that the "crucial" or "devastating" nature of the contested testimony can bear upon the "necessity" prong of the *Roberts* standard. *See generally, Dutton,* 400 U.S. at 87–88, 91 S.Ct. at 219.

then the Court will take care of attempting to get it answered. But we are obviously going to break down if individual jurors want to ask questions of the interpreter or of the witness directly. The reason for that is, some of those questions may be what the law declares to be incompetent. That would result in prejudicial error either to the defendant or to the government.

Now, let's start over again. Mrs. Kim, tell me what question you have about your understanding of an answer, and we'll place the question again to the witness.

After learning from Kim the substance of her confusion, the court asked the prosecution to relay some questions to the witness and examination proceeded thereafter without incident. Contrary to Kim's suspicion, the witness indicated that none of conversations in issue occurred in the restroom.

After the trial judge announced evening recess, he met with the defendant and both counsel and indicated his concern over Kim's conduct. Although it was not until after the incident had occurred that he learned from the court reporter the content of Kim's remark to the interpreter, the judge stated that it was the form of the outburst as much as the language used that disturbed him. After reviewing the juror's conduct during and after the incident, the judge announced that he believed Kim had formed an opinion about the course of events at issue and had developed feelings of anger for either the defendant, the prosecution or the proceedings in general. Because he surmised that such an attitude could infect the other jurors' deliberations, the trial court informed counsel and the defendant that he would dismiss Kim from jury duty the next day. Defense counsel immediately entered a motion for mistrial which the court denied.

The next day, the trial judge interviewed juror Kim in chambers before opposing counsel. Although Kim claimed that she actually stated "it's an idiom" and not "you're an idiot" in response to the interpreter's statement the day before, the court explained that she would have to be excused. Kim admitted that dismissal was understandable and stated that "[t]he problem has bothered me all my life, keeping my mouth shut."

Ruvalcaba claims that juror Kim's dismissal was improper and requires a reversal of his conviction for two reasons: (1) there was insufficient cause to dismiss Kim; and (2) by dismissing Kim, the court inhibited the remaining jurors thereby depriving Ruvalcaba of an impartial jury.

 The law does not support Ruvalcaba's contention. It is the trial court's responsibility affirmatively to detect potentially contaminating influences on juror deliberations and implement appropriate measures to remedy juror misconduct. *United States v. Abascal*, 564 F.2d 821, 833–34 (9th Cir. 1977), *cert. denied*, 435 U.S. 953, 98 S.Ct. 1583, 55 L.Ed.2d 804 (1978). Because it is the trial judge who views juror conduct firsthand, reversal is only appropriate upon a demonstration of abuse of discretion. *See United States v. Berry*, 627 F.2d 193, 197 (9th Cir. 1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 843 (1981); *United States v. Avila-Macias*, 577 F.2d 1384, 1387 (9th Cir. 1978). Our review of the record supports the trial court's ruling. The dismissal was based on the form and procedure of Kim's conduct and the court's perception that Kim was both angry and opinionated. Whether Kim actually used the term "idiot" is irrelevant. Kim's manner, without more, was sufficient to justify the court's conclusion that Kim's attitude could infect the jury. The trial judge acted within the appropriate limits of his discretion in appraising the probability of prejudice and the nature of any initiative he felt compelled to take. *Avila-Macias*, 577 F.2d at 1387.

### VI

 Ruvalcaba's final contention is that the district court erred in imposing a special parole term in connection with his conviction for conspiracy in violation of section 406 of the Comprehensive Drug Abuse Prevention and Control Act of 1970, 84 Stat. 1265, 21 U.C.S. § 846 (1976). Because the Supreme Court recently held that a special parole term may not be imposed for a con-

viction of conspiracy under section 406, *Bifulco v. United States*, 447 U.S. 381, 400, 100 S.Ct. 2247, 2259, 65 L.Ed.2d 205 (1980), the special parole term imposed for the conspiracy conviction must be vacated.

## VII

Having reviewed the record under the appropriate standards, we conclude that substantial nonhearsay evidence of conspiracy and Ruvalcaba's link to it supports the trial court's admission of the coconspirator statements. Moreover, we find that there is no meritorious confrontation clause objection to the introduction of the statements. It is also apparent that the district court's dismissal of juror Kim was proper implementation of its responsibility to identify and isolate potentially contaminating influences on juror deliberation. In view of the Supreme Court's recent pronouncement against imposing special parole terms in connection with conspiracy convictions under section 406, however, that part of the district court's sentence must be vacated.

AFFIRMED IN PART; REVERSED IN PART.