The appellant, Antwone Radford, was indicted for capital murder, and convicted of murder. He was sentenced to life in prison.
 I.
The appellant asserts that the trial court committed reversible error by improperly admitting under Rule 801(d)(2)(E), Ala. R. Evid., what he says were hearsay statements. That rule provides that a statement by a coconspirator made in furtherance of a conspiracy is not hearsay. At trial, the State introduced out-of-court statements of the appellant and others, indicating that there was a collective effort to cover up the appellant's involvement in the shooting death of Derrick Garfield. According to the appellant, there was no evidence, other than the statements of his "coconspirators," that he was involved in a conspiracy. Therefore, he argues, there was no basis for the admission of these statements because, he says, they were inadmissible hearsay and their admission into evidence constituted reversible error.
The evidence at trial tended to show that on the night of August 3, 1996, the appellant, Horace Burgess, Victor Eaton, and Randall Siler left a party in Siler's car to buy cocaine from Garfield. On the way to Garfield's house, they stopped at the house of Burgess's girlfriend, Latonya Spigner, where the appellant picked up a gun Spigner had been keeping for him. They then continued to *Page 757 
Garfield's house. Siler was driving, Burgess was in the front passenger seat, and the appellant and Eaton were in the backseat. Burgess and Eaton each gave the appellant $10 to purchase a gram of cocaine. Siler stated that he was merely driving and that he did not intend to purchase any cocaine. When they reached Garfield's house, the appellant and Burgess got out of the car and, after talking for about two minutes just outside of the car, the appellant walked up the steps to a screen door while Burgess waited beside the steps. The appellant knocked on the door and then went into the house. After about seven or eight minutes, Eaton, who had climbed into the front seat of the car, opened the car door and asked Burgess what was taking so long. Burgess responded that Eaton should remain quiet. As Eaton was telling Siler, "I hope they ain't trying to do nothing stupid," he heard a shot. Eaton looked toward the house and heard a gun fire three times. He saw shadows and quick movement on the porch of the house while the shots were being fired. After the shots, Siler started the car and pulled off. Burgess ran up behind the car and began beating on the trunk. The appellant was running behind Burgess. However, Siler and Eaton did not stop to let either into the car. After stopping by a housing project, Siler dropped Eaton off at his aunt's house.
Garfield's neighbor, Robbie Abrams, heard the gunshots. She saw two black males carrying guns and running away from Garfield's house, and she heard some grunts coming from Garfield's house before she discovered Garfield's body lying face down in the doorway of the porch. She immediately went back to her house and telephoned 911. When the police and paramedics arrived, they discovered that Garfield's pants pockets had been turned inside out, and that, although two guns were found in Garfield's house, no weapons were found near Garfield's body. Twenty-six cents were found in one pants pocket and a small bag containing powder cocaine was found in the other pocket. Garfield died as a result of a gunshot wound to the neck.
Later that evening, Spigner saw Siler pumping gas at a service station. Noticing that he appeared to be worried, she talked with him and the two went to Siler's mother's house. There Spigner called Burgess's mother, "Ms. Brenda." The next day Burgess called Spigner and Ms. Brenda came and picked her up, taking her back to her house. The appellant, Eaton, Siler, Burgess, Ms. Brenda's husband, and her grandchild were also present at the house. Ms. Brenda, her husband, the appellant, and Burgess had gone that morning to Eaton's aunt's house and had coaxed Eaton into coming to Ms. Brenda's house. On the way the appellant and Burgess told Eaton that they were afraid that he was going to "snitch" on them. At Ms. Brenda's house, everyone was talking about the incident that led to Garfield's death. The appellant stated that he did not shoot Garfield intentionally, but that Garfield had tried to "rush" him. Ms. Brenda told the appellant, Burgess, Eaton, and Siler to say that they "went to the club" on the night Garfield was killed. According to Eaton, Burgess then stated, "This is what we going to do. We are going to say that Pablo [the appellant] and Peanut [Eaton's cousin] got into it at the club and they was fixing to get into a fight. And Pablo was drunk and we took him home. And me, you, and Randall and Tonya rode down by the club." It appeared that everyone agreed to this "story." The appellant did not respond to Burgess's statement. The group disbursed after about an hour, but later that day the appellant told Spigner that he would kill her because she knew too much. That night, the appellant, Burgess, and another man went to Eaton's girlfriend's house and knocked on the door. Eaton, who was at the house, did not answer. However, the three men returned 20 minutes later and then a third time, one and one-half hour later, and Eaton finally answered the door. Both the appellant and Burgess stated that they were worried that Eaton would "snitch" on them. Eaton said that he "wasn't going to snitch on nobody." Burgess talked to Eaton on the telephone the following day, telling him:
 "You'll be the first one the detectives talk to. So if they come to you, come to your house, or if they call you and they ask you anything, say you don't know nothing. *Page 758 
Say you ain't seen Pablo that night. . . . Say we went to the club about 10:30."
That same day Siler's mother contacted Siler on his beeper, telling him that the detectives had been looking for him. Before going home, Siler called Ms. Brenda, telling her that the detectives had been by his house. Ms. Brenda, her husband, the appellant, and Burgess drove to where Siler was. The appellant and Burgess told Siler that the detective had been mean to them and that he was not to "run [his] mouth."
After first going home and then to his grandmother's house, Siler went to the police station to make a statement. While he was at the police station, Burgess's sister constantly "beeped" Siler "to inform him on some stuff." Siler telephoned Burgess's house and spoke with Ms. Brenda, the appellant, and Burgess. This conversation was recorded and played before the jury at trial. During the conversation, the appellant told Siler that he would "break [him] something off," meaning that he would pay him for his silence.
The next day, the appellant and Burgess drove to Eaton's girlfriend's house. While Eaton and his girlfriend were standing in the back of the residence, the appellant and Burgess pulled up in the parking lot. Burgess pointed his finger at Eaton, stating, "Boy, don't play with me." Later that day, Eaton agreed to give a statement to the police, telling them about his conversations with the appellant, Burgess, and Ms. Brenda. Eaton telephoned Ms. Brenda, and that conversation, to which Burgess was also a party, was recorded by the police and played at the appellant's trial before the jury. Ms. Brenda and Burgess told Eaton to say that he was not present when Garfield was shot.
At trial, the State introduced evidence of statements made by Burgess and Ms. Brenda, as well as Siler's and Eaton's taped conversations, which implicated the appellant in a scheme to conceal his involvement in Garfield's shooting. Although no charges of conspiracy to commit obstruction of justice were brought, the evidence indirectly served to inculpate the defendant in Garfield's murder. The appellant maintains that these statements were inadmissible hearsay and that their admission constituted reversible error. The State argues that the statements are not hearsay under Rule 801(d)(2)(E), Ala. R. Evid., because they are statements by the appellant's coconspirators in the scope and furtherance of a conspiracy to conceal the appellant's role in the shooting. Statements falling under Rule 801 are not considered exceptions to the hearsay rule, but rather are not considered hearsay at all. However, the appellant argues that no predicate was laid for the admission of such evidence because the State had failed to produce any independent evidence of a conspiracy.
In explaining the requirement that independent evidence of a conspiracy must exist before coconspirators' statements may be admitted, this Court, in Bright v. State, 485 So.2d 398, 401
(Ala.Cr.App. 1986), stated:
 "In Alabama, it is well settled that a felony conviction cannot be had on the uncorroborated testimony of an accomplice. Alabama Code 1975, § 12-21-222. It is just as well established that `[b]efore a co-conspirator's statement or act will be admissible against the accused, proof must be made of the conspiracy.' C. Gamble, McElroy's Alabama Evidence § 195.03(2) (3d ed. 1977). . . .
 "The existence of the conspiracy must be shown by `evidence independent of the hearsay statements' of the co-conspirator. United States v. Cannington, 729 F.2d 702, 711 (11th Cir. 1984). `And evidence of acts or statements deemed to be relevant may not be given until the judge is satisfied that apart from them there are prima facie grounds for believing in the existence of the conspiracy to which they relate.' De Bardeleben v. State, 16 Ala. App. 367, 369, 77 So. 979, 981, cert. denied, 201 Ala. 523, 78 So. 877
(1918). The inference of the conspiracy must be proved by evidence `independent' of the statements of the coconspirators. Collins v. State, 137 Ala. 50, 55, 34 So. 403, 404 (1903). The legal principle for this rule is equivalent to that which states that the testimony of an accomplice cannot be corroborated by the testimony of another accomplice. Ward v. State, 376 So.2d 1112, 1116 (Ala.Cr.App.), cert. denied, 376 So.2d 1117 (Ala. 1979); *Page 759 Knowles v. State, 44 Ala. App. 163, 166, 204 So.2d 506, 510 (1967); Evans v. State, 42 Ala. App. 587, 591, 172 So.2d 796, 800 (1965). `The declaration of an alleged conspirator made outside the presence of accused is not, alone and uncorroborated, sufficient prima facie proof of the existence of a conspiracy, or of the connection of the accused with it; nevertheless, the declaration of each and all of the persons accused as to the existence of the conspiracy, taken together with the conduct of the parties and other evidence, may well constitute the most convincing evidence.' 22A C.J.S. Criminal Law
§ 760 (1961). `This proof of the existence of the conspiracy must be independent of the statements of the defendant's co-conspirators. . . . The initial existence of a conspiracy may not be proved by the statements of the co-conspirators.' Ingle v. State, 415 So.2d 1225, 1228-1229 (Ala.Cr.App. 1982)."
In objecting to the admission of the statements under the coconspirator exclusion, the appellant raised not only a claim that the statements were hearsay, but also a claim that the statements violated his rights to confront his accusers pursuant to the Sixth Amendment of the United States Constitution. Although the appellant appears to have constantly objected on hearsay grounds at trial, the record reflects that the only times he objected on Sixth Amendment confrontation grounds were when the State sought to introduce the tape recording of Eaton's conversation and when Spigner was testifying regarding Ms. Brenda's and Burgess's statements. A hearsay objection does not preserve for our review a claim that one's right to confrontation has been violated, as this Court held in Weaver v. State,591 So.2d 535, 540 (Ala.Cr.App. 1991), quoting California v. Green,399 U.S. 149, 155-56, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970):
 "While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception. See Barber v. Page, 390 U.S. 719 [88 S.Ct. 1318, 20 L.Ed.2d 255] (1968); Pointer v. Texas, 380 U.S. 400
[85 S.Ct. 1065, 13 L.Ed.2d 923] (1965). The converse is equally as true; merely because evidence is admitted in violation of a long-established hearsay rule does not lead to the automatic conclusion that confrontation rights have been denied."
(Footnote omitted.) Therefore, the only claims that the appellant's Sixth Amendment right were violated that have been preserved for our review are the ones related to Eaton's tape recording and Spigner's testimony concerning Ms. Brenda's and Burgess's testimony.
None of the statements at issue, however, were hearsay or violated the appellant's confrontation rights because of the appellant's own statements that were admitted into evidence under Rule 801(d)(2)(A), Ala. R. Evid., as admissions against interest. These statements render the appellant's arguments based upon hearsay and confrontation meritless for two reasons. First, these statements constituted evidence independent of the appellant's coconspirators' statements that a conspiracy existed, thereby forming the basis for the admission of the coconspirator statements under Rule 801(a)(2)(A), Ala. R. Evid. The appellant himself told Eaton that he was worried that he would "snitch" and he told Siler not to "run his mouth." Furthermore, he told Spigner that he would kill her because she knew too much. These statements, in conjunction with the coconspirators' statements and the constant association between the appellant, Burgess, and Ms. Brenda after Garfield's death, provide sufficient evidence there was a conspiracy to cover up the appellant's involvement in the shooting. Therefore, the statements were not hearsay. Rule 801(d)(2)(E), Ala. R. Evid. Second, even if the coconspirators' statements were improperly admitted as hearsay, they were rendered harmless by the admission *Page 760 
of the appellant's own statements. Burgess's and Ms. Brenda's statements telling others to give a certain alibi or to remain quiet do not point any more to the appellant's guilt than do his own statements. In light of the appellant's own statements, the introduction of Burgess's and Ms. Brenda's statements into evidence does not violate the appellant's Sixth Amendment confrontation rights. This Court stated in Grantham v. State,580 So.2d 53, 55-56 (Ala.Cr.App. 1991) (quoting United States v.McClintock, 748 F.2d 1278, 1291-92 (9th Cir. 1984), cert. denied,474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985)):
 "`In Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the Supreme Court "announced that confrontation clause analysis should proceed case-by-case under a two-track approach that tests the necessity and reliability of the contested testimony." United States v. Perez, 658 F.2d 654 at 660 (9th Cir. 1981) (citing Roberts, 448 U.S. at 65-66, 100 S.Ct. at 2538-2539). The first consideration is the "rule of necessity" established by the sixth amendment. Roberts, 448 U.S. at 65, 100 S.Ct. at 2538. "In the usual case . . . the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." Id. This necessity requirement is not "absolute." Perez, 658 F.2d at 661. The government is not required to produce a seemingly available witness when the "utility of trial confrontation [is] remote." Roberts, 448 U.S. at 65 n. 7, 100 S.Ct. at 2538 n. 7. Furthermore, "[t]estimony that is neither `crucial' to the prosecution, nor `devastating' to the defendant might not be subject to the necessity requirement." Perez, 658 F.2d at 661 (citing Dutton v. Evans, 400 U.S. 74 at 87, 89, 91 S.Ct. 210 at 219, 220, 27 L.Ed.2d 213 (1970)). If the government establishes the unavailability of the witness, Roberts then requires that the declarant's statement bear adequate "indicia of reliability." Roberts, 448 U.S. at 66, 100 S.Ct. at 2539.'"
We are unable to find that any of Burgess's or Ms. Brenda's statements were "crucial" to the State or were "devastating" to the appellant. The conspiracy to coverup evidence that the appellant had shot Garfield was revealed through the appellant's own statements. Because Burgess's and Ms. Brenda's statements merely corroborated the appellant's statements, they did not provide a critical blow to the appellant's case. Therefore, the State was not required to show the unavailability of Burgess and Ms. Brenda, and the appellant's Sixth Amendment right of confrontation was not violated.
 II.
The appellant also contends that the trial court violated hisSixth Amendment confrontation rights by admitting a tape recording of Burgess's preliminary hearing testimony into evidence. When Burgess was called by the State as a witness, he invoked his Fifth Amendment privilege against self-incrimination. Burgess then became an "unavailable" witness, allowing the State to introduce his preliminary hearing testimony into evidence under Rule 804(b)(1), Ala. R. Evid. According to the appellant, this former testimony was improperly admitted because it lacked the necessary indicia of reliability.
The appellant's argument that the tape recording of Burgess's former testimony was improperly admitted, however, was not preserved for our review. The only portion of the tape recording that the appellant specifically objected to at trial was Burgess's statement to police. In fact, the trial judge sustained the appellant's objection by admitting the tape recording into evidence under the condition that Burgess's statement to the police be redacted. With no adverse ruling there is no issue for us to review. Jones v. State, 600 So.2d 424, 425 (Ala.Cr.App. 1992). Therefore, the appellant's conviction is due to be affirmed.
AFFIRMED.
LONG, P.J., and COBB, BROWN, and BASCHAB, JJ., concur. *Page 761