UNITED STATES of America,
Appellee,

v.

Wilmer Stanley SNOW, Appellant.

No. 74–3464.

United States Court of Appeals,
Ninth Circuit.

July 24, 1975.

Certiorari Denied Jan. 26, 1976.
See 96 S.Ct. 883.

Atmore L. Baggot (argued), Phoenix, Ariz., for appellant.

Thomas N. Crowe, Asst. U. S. Atty. (argued), Phoenix, Ariz., for appellee.

## OPINION

Before BROWNING and WALLACE, Circuit Judges, and ENRIGHT,* District Judge.

ENRIGHT, District Judge:

Wilmer Stanley Snow was found guilty by a jury of violating 21 U.S.C. § 846, conspiracy to possess cocaine with intent to distribute, and 21 U.S.C. § 841, possession of such cocaine with intent to distribute. On this appeal, Snow's major contentions are that testimony of an agent of the Drug Enforcement Administration ("DEA") regarding statements of a co-conspirator constituted inadmissible hearsay and deprived him of his right to confront witnesses against him. Appellant also raises three additional issues: that the statements, even if falling within the exception to the hearsay rule, should not have been admitted on the non-conspiracy count; that trying him both for conspiracy and for the substantive offense constituted double jeopardy; and that he was prejudiced by the admission of testimony regarding certain criminal activity not related to him. We find no error, and affirm the conviction.

Given the contentions of the defendant, a review of the evidence presented is both appropriate and necessary.

The principal witness for the government was DEA Special Agent Joseph Parra. Parra testified that, on two occasions prior to June 19, 1974, he had purchased a total of approximately 25,000 mini-bennies from Paul Arnpriester. On June 19, Parra and Arnpriester met at the Holiday Inn in Tempe, Arizona, to discuss the quality of the minis. At that

* The Honorable William B. Enright, United States District Judge for the Southern District of California, sitting by designation.

meeting, Arnpriester asked whether Parra knew of anyone who would be interested in purchasing cocaine. Parra expressed interest, and the men discussed price and quantities. When Parra asked whether it would be possible to obtain samples, Arnpriester stated that he would provide some, but that it would take approximately one hour to obtain them. Arnpriester left the Holiday Inn, and returned with a sample approximately ninety minutes later. Parra inquired about the delay, and Arnpriester told him that he had been talking to his "connection" about the possibility of delivering large quantities of cocaine.

During the following week, Arnpriester and Parra met several times, both at the Holiday Inn and at the Minder-Binder Restaurant in Tempe. At one such meeting, Arnpriester told Parra to get into his car so that they could go to the home of his connection to obtain cocaine. After the men had driven a short distance, Arnpriester stopped the car and removed from the glove compartment a paper bag which contained a substance later determined to be cocaine. Parra paid $1,100 for this cocaine.

On June 27, Parra telephoned Arnpriester, who stated that he and his connection would meet Parra at the Holiday Inn. The men met at approximately 11:00 a. m., at which time Parra was introduced to a man whom Arnpriester described as his "main connection." Parra later learned that the "connection" was named Snow; prior to the date of the arrest, he knew him only as Bill. Snow was present at the time of this introduction; there is no indication that he objected to it. Snow asked whether Parra was interested in purchasing cocaine. He assured the agent that it would be inexpensive and of good quality. Snow indicated that he would have no trouble obtaining the cocaine, since he needed merely to rent an airplane and fly to Yuma. He stated that he could provide the cocaine the next day, and that he might even be able to deliver it within two hours. There was conversation regarding elaborate plans to fly to

Mexico in the future for the purpose of smuggling cocaine, and about dropping the price of cocaine if Parra were to become a steady customer. At the conclusion of the meeting, Snow advised Parra to remain in contact with Arnpriester relative to the proposed delivery of cocaine. After the men left the Holiday Inn, Parra had no direct contact with Snow until the day of Snow's arrest.

Parra placed a number of telephone calls to Arnpriester later on June 27, but was told that there would be no delivery that day. A series of meetings between the two men took place during the next several days. On June 28, Parra was told that some problems regarding delivery had developed, but that the price of the cocaine would be lowered if he would accompany Arnpriester and Snow to Yuma. This trip never took place, however, because of a dispute over the method of payment. The next day, Arnpriester stated that he had one-half pound of cocaine, but Parra stated that he wanted a full pound, and refused to purchase the smaller quantity. Arnpriester told him that Snow had gone to Denver for a week, but that he would look for an alternative source.

In subsequent meetings, Parra was told that no alternative source had been located. Finally, on July 9, Arnpriester stated that Snow would return that night, and that he would make arrangements for a sale the next day. On the morning of July 10, Parra was told that Snow had flown to Yuma, and that he was due to return soon. Parra telephoned Arnpriester two or three times every hour. At approximately 1:30 p. m., Arnpriester said that some problems had developed in Yuma, because Snow had not taken enough money. An hour later, Arnpriester said that Snow had arrived, and that the cocaine was at his home.

Parra arrived at Arnpriester's home together with surveillance units. Arnpriester was called to the door, and Parra followed him to an outside door which led directly into Arnpriester's bedroom.

After they entered the room, Arnpriester said that Snow had obtained only three-quarters of a pound of cocaine. He also stated that Snow had returned with a "Mexican connection" who would take the remainder of the money that was owed on the purchase.

Parra left the house, stating that he wanted to get a scale from his car. He gave a prearranged signal to the surveillance units and reentered the house. When a loud noise was heard at the front of the house, Parra, knowing that the other officers had entered, identified himself as an agent. Arnpriester attempted to escape, but was subdued. According to testimony of detective Andrew Lucas, Snow ran out of the house, but Lucas caught him in the driveway. Another individual named Eric Vasquez Ramirez also was arrested.

Snow received his *Miranda* warnings. He stated that the June 27 incident at the Holiday Inn was merely a hoax, and was an attempt to set up Parra for a "rip-off." He stated that he was at the house at the time of the arrest because Gary Bolles, a roommate of Arnpriester, had invited him to come over for a beer. He described Ramirez as a person whom he had once picked up as a hitch-hiker, and with whom he had become friendly.

Two of Arnpriester's roommates also were called as government witnesses. Steven Reich testified that when Snow arrived at the house, he and Ramirez walked directly to the outside door which led to Arnpriester's room, and did not enter the house through the front door as he would have if he were visiting one of the other residents. Gary Bolles denied having spoken to Snow on the telephone on the day of the arrest, or having invited him to come over for a beer.

## I. The Co-Conspirator Exception

The defendant contends that Parra's testimony regarding statements made to him by Arnpriester should have been ex-cluded as hearsay. While conceding the existence of an exception to the hearsay rule for statements of a co-conspirator, the defendant contends that the requirements for admitting such testimony were not met.

The rule which is recognized in this circuit is that otherwise inadmissible hearsay declarations of co-conspirators may be received into evidence when the following foundation is laid: (a) the declaration was in furtherance of the conspiracy; (b) it was made during the pendency of the conspiracy; and (c) there is independent proof of the existence of the conspiracy and of the connection of the declarant and the defendant to it. *Carbo v. United States*, 314 F.2d 718, 735 n. 21 (9th Cir. 1963), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). "If the independent evidence adduced in support of the existence of the conspiracy makes a prima facie case therefore, the *Carbo* foundation requirement can be satisfied." *United States v. Ellsworth*, 481 F.2d 864, 871 (9th Cir.), *cert. denied*, 414 U.S. 1041, 94 S.Ct. 544, 38 L.Ed.2d 332 (1973).

The question for consideration, therefore, is whether, without considering any testimony of Parra regarding statements of Arnpriester, there is sufficient evidence to make out a prima facie showing of a conspiracy.[1] We would find that the evidence of the existence of a conspiracy in this case was ample to permit the admission of the hearsay declarations. The most significant evidence is the account by Agent Parra of his discussion with Snow at the Holiday Inn on June 27, during which Snow described his plans for supplying Parra with cocaine in considerable detail. Other evidence pointing to the existence of a conspiracy includes the facts that Snow was present at the house at the time that the sale of cocaine was to take place, that he had walked directly to Arnpriester's bedroom rather than into the main part of

---

1. The fact that the statements were received in evidence before the proper foundation was laid is of no moment. The order of proof is a matter within the discretion of the trial court.

*United States v. Smith*, 445 F.2d 861 (9th Cir. 1971), *cert. denied*, 404 U.S. 833, 92 S.Ct. 212, 30 L.Ed.2d 165 (1972).

the house, and that he attempted to flee when he learned that law enforcement officers were present. Testimony regarding these two incidents linking Snow and Arnpriester, which occurred two weeks apart, provided strong evidence of a concert of action.

■ Appellant has attempted to refute this evidence of conspiracy by separating the incidents at the Holiday Inn from those at Arnpriester's house. He asserts that the negotiations regarding the delivery of cocaine which took place at the Holiday Inn never passed the talking stage, and therefore never ripened into a conspiracy. He further contends that there is no independent evidence to support a finding that there was a conspiracy to supply the cocaine actually seized by Parra. The foundational determination of whether these events were part of a single, overall conspiracy is a question of fact which must be resolved by the trial court based on all of the evidence presented. *Cf. United States v. Roselli*, 432 F.2d 879, 898 (9th Cir. 1970), *cert. denied*, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). There was sufficient evidence to allow the trial court to find the existence of a single conspiracy relating to the cocaine.

II. *Confrontation*

The second contention raised by the appellant is that, even conceding sufficient evidence to satisfy the foundational requirements of the co-conspiracy exception, the statements should have been excluded, because their admission denied him his constitutional right to confront and cross-examine his accuser.

■ The fact that evidence is admissible under the co-conspirator exception does not automatically demonstrate compliance with the Confrontation Clause. *United States v. Baxter*, 492 F.2d 150,

177 (9th Cir. 1973), *cert. denied*, 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974).[2] "[T]he mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.'" *Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970) (plurality opinion).

■ The *Dutton* plurality sets forth the issue to be considered in determining whether the Confrontation Clause has been violated. The test, as restated by this court, is whether, "under the circumstances, the unavailability of the declarant for cross-examination deprived the jury of a satisfactory basis for evaluating the truth of the extrajudicial declarations." *United States v. Adams*, 446 F.2d 681, 683 (9th Cir.), *cert. denied*, 404 U.S. 943, 92 S.Ct. 294, 30 L.Ed.2d 257 (1971). Whether a defendant was denied the right to confront and cross-examine witnesses must be resolved case-by-case, based on an examination of all of the circumstances and evidence. *Id.* at 683; *Arias v. United States*, 388 F.Supp. 736, 738 (C.D.Cal.1975).

The *Dutton* plurality opinion sets forth a number of factors which were indicative of reliability in that case: (1) the declaration contained no assertion of a past fact, and consequently carried a warning to the jury against giving it undue weight; (2) the declarant had personal knowledge of the identity and role of participants in the crime; (3) the possibility that the declarant was relying upon faulty recollection was remote; and (4) the circumstances under which the statements were made did not provide reason to believe that the declarant had misrepresented the defendant's involvement in the crime. *Dutton v. Ev-*

---

2. There is some authority for the proposition that evidence admissible under the co-conspirator exception automatically satisfies the Confrontation Clause. The First Circuit has found such automatic compliance. *Ottomano v. United States*, 468 F.2d 269, 273 (1st Cir. 1972), *cert. denied*, 409 U.S. 1128, 93 S.Ct. 948,

35 L.Ed.2d 260, *reh. denied*, 410 U.S. 948, 93 S.Ct. 1383, 35 L.Ed.2d 616 (1973). There is a suggestion of this rule in at least one decision of this circuit. *United States v. Everidge*, 488 F.2d 1 (9th Cir. 1973). However, we reaffirm the fact that *Baxter* correctly states the rule in this circuit.

*ans, supra,* 400 U.S. at 88–89, 91 S.Ct. 210.

Factors (2) and (3) are applicable to this case. In addition, the trier of fact was provided with a great deal of additional information which would support the view that the hearsay statements were trustworthy, and that Arnpriester had not misrepresented Snow's participation in the crime.[3] As in *Dutton,* the declarations were against penal interest. *Id.* at 89, 91 S.Ct. 210. There was no reason to question Arnpriester's characterization of Snow as his "connection." Arnpriester believed Parra to be a potential customer, not a government agent, and would have had little apparent motive to falsify in this regard. *United States v. Puco,* 476 F.2d 1099, 1104 (2d Cir.), *cert. denied,* 414 U.S. 844, 94 S.Ct. 106, 38 L.Ed.2d 82 (1973).

On the day of the arrest, Arnpriester told Parra that Snow had arrived with a "Mexican connection." This testimony was corroborated by the presence of Snow and Ramirez at Arnpriester's house. The declaration about the quantity of cocaine delivered by Snow and the reason he was late—because he did not bring enough money to purchase a full pound of cocaine—were confirmed by the three-quarter-pound bag of cocaine seized immediately after Snow's arrest.

In addition, statements made by Snow at the Holiday Inn on June 27 support the conclusion that Arnpriester's statements were truthful. Snow's description of the method used to obtain the cocaine was similar to that which Arnpriester described during telephone conversations on the day of the arrests. Snow's remarks relating to price and quantity of the cocaine were the same as those which Arnpriester had made a week earlier.

Finally, incidents at the meeting of the three men at the Holiday Inn indicated Snow's faith in Arnpriester.

There is no indication that Snow, when introduced by Arnpriester as his "main man," objected to that characterization. At the conclusion of the meeting, Snow told Parra to keep in touch with Arnpriester, so that he would know when the cocaine had been obtained.

We have concluded that the testimony regarding the hearsay statements of the co-conspirator were sufficiently trustworthy to meet the requirements of the Confrontation Clause. The *Dutton* plurality opinion indicates, however, in discussing earlier cases dealing with the right of confrontation, that under certain circumstances, the Confrontation Clause might require the exclusion of testimony even though the jury has been provided with a satisfactory basis for evaluating it. *Dutton v. Evans, supra* at 400 U.S. 87, 91 S.Ct. 210. We find no ground for holding that this case falls within any exception to the general rule set forth in *Dutton* and the previous decisions of this circuit.

The testimony regarding extrajudicial statements of Arnpriester, although constituting a significant portion of the testimony at trial, was not so "crucial" to the prosecution or "devastating" to the defense as to require reversal of the conviction. The defendant's own statements regarding the proposed cocaine transaction and his presence at the house at the time at which the sale was to occur were far more damaging than those statements of the co-defendant. Appellant makes no claim that any of the other circumstances discussed in the *Dutton* case—use of a coerced confession, prosecutorial misconduct, the use of a paper transcript, problems of a joint trial, or wholesale denial of cross-examination—are present in this case.

The government contends that there is no Confrontation Clause problem, because the defendant was free to subpoena Arnpriester to testify. The defendant argues, however, that the burden of producing evidence is upon the

---

**3.** The defendant had the opportunity to subject Agent Parra to detailed cross-examination on the issue of whether the statements in question in fact were made. *Dutton v. Evans, supra* at 88, 91 S.Ct. 210.

prosecution, and the defendant has no obligation to produce witnesses. Neither the Supreme Court nor the circuit ever has held that the government is under the obligation to subpoena and produce all available witnesses before it can avail itself of the co-conspirator exception to the hearsay rule. The appellant argues that the holding of *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), prohibits the use by the prosecution of hearsay statements of witnesses who are available but are not called to testify; however, the *Dutton* opinion makes it clear that the rule stated in *Barber* is limited to a particular hearsay exception, relating to the use of a transcript of preliminary hearing testimony, which is applicable only if the witness is unavailable. *Dutton v. Evans, supra*, 400 U.S. at 85, 91 S.Ct. 210.

 While it is unquestioned that the government has the burden of producing evidence showing the guilt of the accused beyond a reasonable doubt, it does not have the burden of calling every witness whose testimony would support a verdict of guilty, and it need not call a witness, equally available to both sides, merely because cross-examination of such a witness might prove helpful to the defense case.

Although this court finds no error in the admission of Arnpriester's hearsay declarations in this case, we are aware of the difficulties which such testimony creates.

> We are not unmindful of the difficult circumstances which place the defendant in a position where [he] finds [himself] defending against words [he] did not hear, at times unknown to [him], spoken by a person unavailable for cross-examination whose relationship to [him] is at best maintained by legal fictions. *United States v. Randall*, 491 F.2d 1317, 1319 (9th Cir. 1974).

We are also cognizant of the problems which would be created for the prosecution if it were uniformly required that the government call such a witness within its own case. The sworn testimony of such a potentially hostile witness might immediately be the subject of the government's own attempt to impeach by the use of prior inconsistent statements. Additional concerns would also be created by the possible utilization of the Fifth Amendment privilege and the ancillary problems arising from the assertion of such claims before the trier of fact.

Extensive use of hearsay declarations of a co-conspirator also places the trial court in an unusual position. Under the test set forth in *Dutton*, the court is forced to make its initial ruling on the admissibility of the evidence at a time when there is far too little testimony before it to permit a determination of whether the defendant would be denied his right of confrontation by its admission.[4] Nevertheless, in the context of the case now before us, we hold that the admission of this testimony was not erroneous.

### III. *Other Issues*

 The defendant argues that, even if the hearsay declarations of Arnpriester fell within the exception to the hearsay rule, their admission should have been confined to the conspiracy count, and they should not have been admitted on the substantive possession count. The admissions and statements of a co-conspirator are admissible even where there is no charge of conspiracy, as long as there is independent evidence of a concert of action. *United States v. Williams*, 435 F.2d 642, 645 (9th Cir. 1970), *cert. denied*, 401 U.S. 995, 91 S.Ct. 1241, 28 L.Ed.2d 533 (1971). Once the proper foundation was laid, the statements were admissible on both counts.

 Snow next asserts that he was twice put in jeopardy by his conviction for both conspiracy to possess and possession of cocaine. The courts consist-

---

4. *See Arias v. United States*, 388 F.Supp. 736 (C.D.Cal.1975).

ently have upheld the right of Congress to proscribe separate punishments for conspiring and the underlying crime. *United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 1268, 43 L.Ed.2d 541 (1975); *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

The defendant relies on *Freeman v. United States,* 146 F.2d 978 (6th Cir. 1945) for the proposition that where a substantive offense is included as an element of conspiracy, there is double punishment for a single act. Even if we were to adopt that *Freeman* rule, we read that opinion to hold only that where the proof of the conspiracy proves every essential element of the substantive offense, the acts can be punished only as a single offense. In this case, the allegation of the conspiracy included twenty-six overt acts not involved in the June 27 possession count, and the proof at trial included several of these additional acts. There was no violation of the double jeopardy prohibition.[5]

Finally, the defendant contends that the admission of evidence regarding sales of mini-bennies prior to June 19 was improper and prejudicial. There was no evidence connecting Snow to these transactions. A review of the record indicates that both the court and the prosecutor attempted to restrict references by Parra to these transactions, and that the direct testimony regarding these sales was very limited. The trial court gave the defense an opportunity to prepare and submit a cautionary instruction relating to this testimony, and the court gave both the defendant's proposed instruction and one of its own. We hold that the giving of such instructions was sufficient, under the facts of this case, to cure any prejudice which might have arisen.

The conviction is affirmed.

5. Even assuming *arguendo* that there was a violation of the Double Jeopardy Clause, no consecutive sentences were imposed in this case. The defendant was sentenced under the Federal Youth Corrections Act, 18 U.S.C. § 5010(b). Even if a conviction on one of the two counts were overturned, the commitment could be upheld upon the other charge, under the concurrent sentence doctrine. *United States v. Andrino,* 497 F.2d 1103, 1108 (9th Cir. 1974).