**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William GREENE, Defendant-Appellant.**

**No. 81–1405.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 12, 1982.

Decided Jan. 28, 1983.

Edward P. Davis, San Jose, Cal., argued for defendant-appellant; John G. Milano, San Francisco, Cal., on brief.

Henry Wykowski, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Before GOODWIN, WALLACE, and FLETCHER, Circuit Judges.

WALLACE, Circuit Judge:

Greene appeals his conviction on two counts of willfully attempting to evade federal income taxes in violation of 26 U.S.C. § 7201. A jury found that Greene had understated his taxable income for the years 1973 and 1974. Greene raises numerous contentions on appeal, none of which requires reversal of his conviction. We affirm.

I

After a routine audit of Greene's 1973 and 1974 income tax returns, the Internal Revenue Service (the Service) began an investigation which was subsequently referred to the Criminal Investigation Division and assigned to Special Agent Stephens. Stephens encountered resistance from both Greene and his attorney: Greene refused to answer any of his questions or provide any of his records. Therefore, Stephens used the net worth method to ascertain whether Greene had evaded income taxes. Essentially, the government estimated the increase in Greene's net assets and determined what his tax should be.[1]

Invoking the net worth method at trial, the government introduced the testimony of 59 witnesses and 345 exhibits in order to prove that Greene had unreported income in 1973 and 1974 upon which a tax of $97,000 was due. The government's final witness, a Service agent, qualified as an expert, drew conclusions from the evidence. A net worth summary he had prepared was distributed to the jurors without objection. The agent testified that during the years in question, Greene maintained 19 bank accounts, 5 impound accounts, 10 notes receivable, 23 brokerage accounts at 9 broker-

age houses, and 32 properties. After reviewing Greene's various liabilities during the period in question, the agent explained how he had arrived at net worth, adjusted gross income, and finally unreported income. The agent further testified that there was evidence revealing that Greene had received income from the sale of property, from his closely held corporation, American Equities, and from interest income on loans to individuals, none of which was reported on his 1973 and 1974 returns.

In his defense, Greene testified that the increase in his net worth, which the government ascribed to unreported income, was actually attributable to money repatriated from foreign bank accounts opened in the 1960's. He testified that he had moved to Europe in order to avoid litigation with his estranged wife and transferred substantial assets to these accounts. McNaughton, a twice-convicted felon, testified that he had received funds from Greene in 1972, 1973, and 1974, which came from a bank in Liechtenstein. McNaughton testified that after depositing these funds in his own account, he returned virtually all of the money to Greene. Although Greene had supplied certain information to the government pursuant to a pretrial motion for reciprocal discovery, he did not disclose the existence of the alleged Liechtenstein bank account, identified only by a number, until after trial had begun. Furthermore, although Greene called two expert witnesses who testified as to the effect of the alleged foreign bank accounts on the government's net worth computations, neither expert could point to any evidence that any foreign account was in fact Greene's.

The principal issues raised in this appeal are whether the district judge erred when he denied Greene's motion to dismiss the indictment on the ground of selective prose-

---

1. Under the net worth method of proof, the government first establishes the net worth (assets less liabilities) of the taxpayer at the beginning and end of the period in question. If the closing net worth figure is greater, the difference is the increase in the taxpayer's net worth during the given period. The taxpayer's nondeductible expenditures are estimated and add-

ed to this figure and all known nontaxable income is subtracted. The resulting figure is compared to the reported taxable income on the taxpayer's return. If the figure is greater than that reported by the taxpayer, the government claims the difference is unreported income.

cution, whether Count I of the indictment was returned within the six-year statute of limitations, whether there was substantial evidence of a tax deficiency to support the jury's verdict, and whether the prosecution's inquiry into Greene's pretrial silence deprived Greene of his fifth amendment rights.

## II

Greene brought a pretrial motion to dismiss the indictment based upon selective prosecution. The district court denied the motion and we affirmed on an interlocutory appeal. *United States v. Greene,* No. 81–1124 (March 30, 1981). During trial, Greene contended that new evidence demonstrated that the government intentionally misrepresented its motives for prosecution. This new information was contained in Agent Stephens's report which states in part:

> Consideration should be given to Greene's prosecution since he is actively instructing seminars in "tax avoidance" in how to make millions without paying taxes. The prosecution of Greene may act as a deterrent to further attempts by other individuals to evade income taxes.

Greene claims that this statement is inconsistent with Stephens's declaration filed in opposition to the original motion to dismiss in which he stated that his recommendation to prosecute was based solely on his investigation which showed that Greene had willfully failed to report substantial amounts of taxable income on his 1973 and 1974 tax returns. Obviously Stephens's report produced at trial is inconsistent with his declaration. Nevertheless, we agree with the district court that Greene has not carried his burden of showing improper selective prosecution.

■■■ To succeed on a claim of selective prosecution, the defendant has a two-part burden. He must establish both "that others similarly situated have not been prosecuted and that the allegedly discriminatory prosecution ... was based on an impermis-

sible motive." *United States v. Ness,* 652 F.2d 890, 892 (9th Cir.), *cert. denied,* 454 U.S. 1126, 102 S.Ct. 976, 71 L.Ed.2d 113 (1981). *See also United States v. Wilson,* 639 F.2d 500, 503–04 (9th Cir.1981). Greene has failed to make an adequate showing of either prong of this test. Ruling on Greene's pretrial motion to dismiss, the district court found that Greene had offered no evidence that others similarly situated were generally not prosecuted for such conduct. Greene has still failed to make that required showing; Stephens's report is relevant only to the question of impermissible motive. But even as to that issue, Stephens's report, in and of itself, does not provide adequate proof. Stephens's recommendation for criminal tax prosecution was reviewed by the Chief of the Criminal Investigation Division, the District Director, the District Counsel, and the Tax Division of the Department of Justice. As we observed in *United States v. Erne,* 576 F.2d 212 (9th Cir.1978), "the ultimate decision to prosecute is several steps removed from the revenue officer." *Id.* at 216. Thus, even assuming that Stephens's initial role in referring the matter for prosecution involved an improper discriminatory motive, such a showing would be "insufficient to taint the entire administrative process." *Id.* at 216–17. The district court did not err in refusing to dismiss the indictment for selective prosecution.

## III

Greene contends that Count I of the indictment, charging him with evasion of income taxes for the year 1973, was time barred. Title 26 U.S.C. § 6531 provides that an indictment for tax evasion must be returned within six years after the commission of the offense. However, where third-party summons enforcement proceedings are necessary, as in this case, 26 U.S.C. § 7609(e) operates to suspend the limitations period.[2] Thus, although the indict-

---

**2.** Section 7609(e) provides:

*Suspension of statute of limitations.*—If any person takes any action as provided in

subsection (b) and such person is the person with respect to whose liability the summons is issued (or is the agent, nominee, or other

ment was returned over six years after the alleged date of the 1973 tax year offense, the government demonstrated in the district court that due to the suspension of the statute of limitations for enforcement proceedings, the limitation period as to Count I did not expire until January 17, 1981, four days after the return of the indictment. Greene argues that the district court erred in its computation by including in the suspension period six days attributable to a summons enforcement proceeding concerning the trustee in bankruptcy for Laidlaw & Company (Laidlaw), a brokerage firm. We disagree.

On April 8, 1977, investigating agents issued and served a summons to Angel of Laidlaw. Greene then exercised his right pursuant to 26 U.S.C. § 7609(b)(2) to stay the summons by giving Angel written notice of his request that Laidlaw refrain from compliance.[3] The agents were subsequently informed that Laidlaw was in bankruptcy, and, therefore, on May 5, 1977, issued a second summons for the Laidlaw records and served it on Baratta, the attorney for the trustee in bankruptcy. Greene then gave the trustee written notice that he should not comply with the summons absent further directions. On September 6, 1977, Greene informed Angel by letter that he no longer objected to his compliance with the April 8, 1977 summons. The letter indicates that a copy was sent to the Service, but not that a copy was sent to the trustee who was in possession and control of Laidlaw's records. Greene argues that the subsequent enforcement proceedings against

the trustee were unnecessary, because his September 6, 1977 letter to Laidlaw was a complete withdrawal of his objections. He asserts that the six days added to the suspension period, representing the time from the institution of enforcement proceedings against the trustee to the time that Greene withdrew his objection to the trustee, should not have been included.

Greene argues that the suspension of the statute of limitations authorized under section 7609(e) should not be allowed because the enforcement proceedings became unnecessary when he withdrew his objection to the third-party summons. Section 7609(e) merely provides that the statute of limitations shall be suspended for the period during which a proceeding with respect to the enforcement of a third-party summons is pending. However, section 7609(e) applies where a person has exercised his right to stay compliance under 7609(b)(2).[4] Thus, Greene argues that a 7609(e) suspension should not apply where the taxpayer is no longer exercising his right to stay compliance under section 7609(b)(2).

▮ Unfortunately, Congress has only specified how a taxpayer exercises his right to stay compliance of a third-party summons under 7609(b)(2), not how he withdraws or revokes his previously exercised objection. However, since section 7609(b)(2) requires that a taxpayer give written notice to both the third-party record holder and the Service in order to stay compliance with a summons, it is reasonable to infer that Congress intended such a stay

person acting under the direction or control of such person), then the running of any period of limitations under section 6501 (relating to the assessment and collection of tax) or under section 6531 (relating to criminal prosecutions) with respect to such person shall be suspended for the period during which a proceeding, and appeals therein, with respect to the enforcement of such summons is pending.

3. Section 7609(b)(2) provides:
*Right to stay compliance.*—Notwithstanding any other law or rule of law, any person who is entitled to notice of a summons under subsection (a) shall have the right to stay compliance with the summons if, not later

than the 14th day after the day such notice is given in the manner provided in subsection (a)(2)—
(A) notice in writing is given to the person summoned not to comply with the summons, and
(B) a copy of such notice not to comply with the summons is mailed by registered or certified mail to such person and to such office as the Secretary may direct in the notice referred to in subsection (a)(1).

4. Section 7609(e) is also applicable when a taxpayer exercises his right to intervene in any enforcement proceeding under section 7609(b)(1).

to remain in effect until a written withdrawal of objection is received by both the Service and the person summoned. In this case no such written withdrawal was sent to the trustee prior to the initiation of the enforcement action. Greene's argument that its withdrawal letter to Laidlaw was an authorization to the trustee to comply with the summons is unconvincing. The letter referred specifically to his April 20, 1977 letter regarding the first summons. It concludes "Mr. Greene no longer maintains his objection to *your* compliance with that summons." (Emphasis added.) As we see it, such a letter does not grant authority to the trustee to comply with the summons. The fact that no copy was sent to the trustee supports this conclusion.

We conclude that at the time enforcement proceedings were instituted against the trustee, Greene was still exercising his right to stay compliance under section 7609(b)(2). Thus, the district court was correct in adding six days to the suspension period representing the time between the institution of the enforcement action and notification of Greene's withdrawal of his objection. The statute of limitations, therefore, had not run on Count I of the indictment.[5]

## IV

■■■ The net worth method employed by the government to estimate Greene's taxable income for the tax years 1973 and 1974 attempts to show unreported taxable income through circumstantial evidence. The Supreme Court approved this method in *Holland v. United States,* 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954) (*Holland*), and we have recognized it on numerous occasions. *E.g., United States v. Hall,* 650 F.2d 994 (9th Cir.1981); *United States v. Hamilton,* 620 F.2d 712 (9th Cir.1980); *United States v. Gardner,* 611 F.2d 770 (9th Cir.1980). The net worth method of establishing taxable income may be employed if

the government (1) accurately establishes the taxpayer's opening net worth, (2) identifies a likely source of taxable income from which it may be inferred that the taxpayer's increase in net worth arose, and (3) conducts a reasonable investigation of any leads that suggest that the taxpayer properly reported his income. *Holland, supra,* 348 U.S. at 132–38, 75 S.Ct. at 133–134, 136; *United States v. Hamilton, supra,* 620 F.2d at 714; *United States v. Gardner, supra,* 611 F.2d at 775. When this method is used, it "triggers special protections for the accused and particularly careful scrutiny by the courts," *United States v. Hall, supra,* 650 F.2d at 997, which should bear "constantly in mind the difficulties that arise when circumstantial evidence as to guilt is the chief weapon of a method that is itself only an approximation." *Holland, supra,* 348 U.S. at 129, 75 S.Ct. at 132. Nonetheless, we must uphold the verdict of the jury if, viewing the evidence in the light most favorable to the government, there is relevant evidence from which the jury could reasonably have found Greene guilty beyond a reasonable doubt. *United States v. Gardner, supra,* 611 F.2d at 775; *see United States v. Friedman,* 593 F.2d 109, 115 (9th Cir.1979).

Greene asserts that the government did not comply with any of the three *Holland* requirements. As to the third, he argues that the government failed to follow all reasonable leads concerning his repatriated foreign cash hoard. Greene argues that the government had sufficient reason to investigate the possible existence of foreign bank accounts because it knew of his extended residence in Europe and Mexico after a period of time during which he had acquired substantial wealth and knew also that he had engaged in foreign business activities and was in possession of a foreign account after the prosecution years. Furthermore, he points out that the government had knowledge of an attempted deposit into one of his domestic accounts from

---

**5.** Because of our disposition of this issue, we need not address the government's argument that under section 7609(e) the statute of limitations is suspended an additional 60 days repre-

senting the time during which an appeal could have been taken from the issuance of an enforcement order.

a foreign account sometime after the taxable years in question.

It is of course impossible for the government to negate every possible nontaxable source. In the typical case, the taxpayer provides the Service with "leads" to possible nontaxable sources. Some cases hold that the government satisfies its burden under *Holland* if it negates each of these leads. *E.g., Kramer v. Commissioner*, 389 F.2d 236 (7th Cir.1968). Here, however, Greene provided no leads for the government to negate. It was not until trial that Greene asserted his repatriated foreign cash hoard defense. Thus, the question before us is what burden of investigation does the "reasonable leads" prong of the *Holland* test demand when the taxpayer provides the government no leads prior to trial.

■ The *Holland* "reasonable leads" doctrine places on the government the duty of "effective negation of reasonable explanations by the taxpayer inconsistent with guilt"—a duty limited to the investigation of "leads reasonably susceptible of being checked, which, if true, would establish the taxpayer's innocence." 348 U.S. at 135–36, 75 S.Ct. at 135. The Supreme Court has held specifically that "where relevant leads are not forthcoming, the Government is not required to negate every possible source of nontaxable income, a matter peculiarly within the knowledge of the defendant." *Id.* at 138, 75 S.Ct. at 137. The government is not required to embark on "Magellan-like expedition[s]," *see United States v. Hiett*, 581 F.2d 1199, 1201 (5th Cir.1978), or pursue "phantom clues as to some mysterious sources and assets." *United States v. Hamilton, supra*, 620 F.2d at 715. The government must, of course, enjoy some discretion in the area of investigation of leads. *Cf. Holland*, 348 U.S. at 135, 75 S.Ct. at 135 (stating that it is not up to the courts to prescribe investigative procedures). However, the government is not the final arbiter in determining which leads are relevant or reasonably susceptible of investigation. These questions involve factual determinations by the jury as to whether the government was unreasonable in its failure to

investigate the taxpayer's alleged sources of nontaxable income. In dealing with a similar cash hoard defense revealed for the first time during trial, the Second Circuit stated:

> To impose on the government the burden of anticipating that appellant would change his version and of negating a possible contrary story with respect to matters peculiarly within appellant's personal knowledge is to ask the impossible. The evidence presented a clear issue of fact and the jury was entitled to infer, as it apparently did, that appellant's "cash hoard" testimony was a belated and blatant concoction which was not entitled to any credit.

*United States v. Gay*, 567 F.2d 1206, 1207 (2d Cir.1978). Here, viewing the evidence in the light most favorable to the government, there is sufficient evidence to support the jury's verdict on the question of investigating reasonable leads.

Greene's contention that Agent Stephens knew of the existence of his numbered Liechtenstein account or any other foreign bank accounts belonging to Greene during the years 1973 and 1974 is not supported by the record. Stephens testified that Greene's returns referred to an interest in numerous foreign bank accounts of American Equities. Greene filed Form 4683, entitled *U.S. Information Return on Foreign Bank, Securities, and Other Financial Accounts*, with his 1973 and 1974 returns. He checked a box indicating a financial interest in 25 or more foreign accounts. Attached to Form 4683 was a statement describing Greene's business of tracing abandoned property and explaining that he had a financial interest in many accounts representing his potential fee for collection. His statement concludes, "These fees, when realized, are transmitted to the USA and are reported by American Equities Group, the company for which I work." Although Form 4683 and its attachment obviously put the Service on notice that Greene was conducting business in foreign countries, it gave no indication, either explicit or implied, that Greene held personal bank

accounts in which he had accumulated a significant cash hoard.

Greene contends that the government totally ignored the cash he held in foreign banks, despite being made aware of the existence of these foreign accounts through its own investigation. However, from our review of the record, it is not apparent that the government knew of such accounts and was intentionally ignoring them. Greene's accountant testified that he did not recall telling the agent conducting Greene's 1973 audit about Greene's bank account at the Bank of the Middle East in Lebanon. Agent Stephens testified that during the course of his investigation he did not become aware of any foreign bank accounts which he could identify as belonging to Greene. Stephens did state that he "found indications that there were transactions involving foreign banks." In particular, he testified that in 1976 Greene attempted to deposit a check drawn on a foreign bank into one of his domestic accounts, but that he did not believe that the check indicated that Greene had a personal account in Lebanon. Knowledge of this isolated transaction did not warrant a world-wide search for Greene's foreign bank accounts. The Service had no reason to suspect that the foreign check was drawn on Greene's account, and Greene has offered no explanation why the Service's knowledge of this attempted foreign deposit constituted a "reasonable lead." To the contrary, the fact that the Service did not discover Greene's numbered Liechtenstein account and did not pursue an overseas investigation when learning of the attempted deposit in 1976 is totally consistent with Greene's testimony and defense theory that at all times prior to the commencement of the trial he had kept the existence of such an account secret. Greene never mentioned the account to either his accountants or the woman who lived with him, and he testified at length as to the circuitous manner in which he repatriated funds with the help of McNaughton. Finally, even Greene's own experts admitted that the only evidence of the Liechtenstein account was Greene's trial testimony. In light of the above, we are convinced that the protections established by the *Holland* "reasonable leads" doctrine have not been violated and that the evidence is sufficient to support the jury's determination on this issue.

██ Greene also challenges the government's opening net worth figure. An essential condition is the establishment, with reasonable certainty, of an opening net worth figure to serve as a starting point from which to calculate increases in the taxpayer's net assets. *Holland, supra,* 348 U.S. at 132, 75 S.Ct. at 133–134. Viewing the evidence in the light most favorable to the government, *United States v. Hamilton, supra,* 620 F.2d at 715, the government clearly presented sufficient evidence from which the jury could infer that Greene's opening net worth figure had been proven with reasonable certainty. Greene does not contest the government's net worth computations, but rather contends that the government's opening net worth figure is understated by the amount of his assets held in foreign bank accounts. However, the jury could reasonably conclude that Greene's foreign cash hoard defense lacked credibility. In doing so, the jury could draw adverse inferences from the late stage at which defense evidence was disclosed in spite of the motion for reciprocal discovery, Greene's failure to reveal the existence of the Liechtenstein account to his own tax return preparers even though he was under audit, Greene's testimony that he retained no records concerning over $100,000 he sent to McNaughton and had no proof that he actually received the money back from McNaughton, Greene's failure to offer any proof other than his own testimony that the Liechtenstein account was in fact his, McNaughton's testimony that he had no knowledge regarding some of the exhibits introduced through him including that he did not recall the amounts of certain bank draft receipts or to whom the bank drafts were sent, the change in McNaughton's testimony regarding the first money received from Greene, and McNaughton's lack of any recollection or records regarding it.

Finally, Greene contends that the government failed to identify a likely source of taxable income from which his increase in net worth could have arisen. However, the government need not prove specific sources for all the allegedly unreported income as Greene appears to argue. The government is only required to prove "a likely source, from which the jury could reasonably find that the net worth increases sprang." *Holland, supra,* 348 U.S. at 138, 75 S.Ct. at 138. *See also Whitfield v. United States,* 383 F.2d 142, 144–45 (9th Cir. 1967). "To obtain a proper verdict of conviction, the prosecution must establish evidence sufficient to convince the jury beyond a reasonable doubt that the inference of a taxable source should be made." *United States v. Hall, supra,* 650 F.2d at 997–98. Here, the government made such a showing through testimony establishing several likely sources of unreported income including real estate sales, income from American Equities, interest income on loans to individuals, and unreported securities transactions. The jury could reasonably infer that the net worth increase sprang from a taxable source.

## V

Greene contends that the prosecutor's attempt to cross-examine him about his failure to raise the defense of a "cash hoard" in foreign bank accounts was an improper comment on his pretrial silence in violation of the fifth amendment. Greene also alleges constitutional error due to certain statements made during the prosecutor's closing arguments concerning his pretrial silence. The government argues that neither the prosecutor's attempt to cross-examine Greene nor his closing arguments can be construed as a comment on Greene's silence. The government claims that the prosecutor was merely cross-examining and commenting on Greene's knowledge of the government's criminal investigation and failure to disclose his exhibits under the court's order.

We need not decide whether the prosecutor's statements were actually comments on Greene's pretrial silence. Even assuming that they were, under *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) (*Jenkins*), there was no fifth amendment violation. There, the Court held that the fifth amendment guarantee of the right to remain silent is not violated when a defendant's credibility is impeached with his own prearrest silence. *Jenkins, supra,* 447 U.S. at 238, 100 S.Ct. at 2129. The defendant was cross-examined regarding his prearrest silence with respect to a stabbing that he claimed during trial was in self-defense. The Court thus reaffirmed *Raffel v. United States,* 271 U.S. 494, 46 S.Ct. 566, 70 L.Ed. 1054 (1926), which held that a criminal may be questioned as to his silence at his first trial when he takes the stand in his own defense on retrial. Greene argues that *Jenkins* is not applicable in this case, since it involved a defendant who was neither under criminal investigation nor asserting his fifth amendment rights, as he contends he was doing, upon advice of counsel. However, as the Court stated in *Jenkins, Raffel* "clearly permits impeachment even if the prearrest silence were held to be an invocation of the Fifth Amendment right to remain silent." 447 U.S. at 236 n. 2, 100 S.Ct. at 2128 n. 2. Thus, *Jenkins* is not limited, as Greene argues, to situations where the defendant is not exercising his fifth amendment right to remain silent.

Greene further argues that the critical factor in *Jenkins* is that "no governmental action induced [the petitioner in that case] to remain silent before arrest." *Id.* at 240, 100 S.Ct. at 2130. Greene argues that here his reliance upon his fifth amendment privilege was a direct response to governmental action: the criminal investigation instituted by the Service. Greene misconstrues the Court's statement. After deciding that cross-examination as to prearrest silence does not violate the fifth amendment, the Court in *Jenkins* addressed the question whether such use of prearrest silence denied the petitioner fundamental fairness as guaranteed by the fourteenth amendment. The Court distinguished the case before it from the situation where the defendant had received *Miranda* warnings as in *Doyle v.*

*Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). In discussing *Doyle,* the Court in *Jenkins* stated:

> *Miranda* warnings inform a person that he has the right to remain silent and assure him, at least implicitly, that his subsequent decision to remain silent cannot be used against him. Accordingly, " 'it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony.' "
>
> . . .
>
> *In this case, no governmental action induced petitioner to remain silent before arrest.* The failure to speak occurred before the petitioner was taken into custody and given *Miranda* warnings. Consequently, the fundamental unfairness present in *Doyle* is not present in this case.

*Jenkins, supra,* 447 U.S. at 240, 100 S.Ct. at 2130 (footnote and citation omitted; emphasis added), *quoting Doyle v. Ohio, supra,* 427 U.S. at 619, 96 S.Ct. at 2245.

■ The record does not indicate, nor does Greene argue, that he received *Miranda* warnings. Instead, Greene attempts to extend the holding of *Doyle* by pointing to the Court's language in *Jenkins* regarding the governmental action that induced the defendant's silence. However, it is clear from the recent decision of *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982) (per curiam), that the Court did not intend to expand *Doyle* by use of this language. In *Fletcher,* the record did not indicate whether the defendant was immediately given his *Miranda* warnings. The court of appeals concluded that a defendant could not be impeached by use of his post-arrest silence even if *Miranda* warnings had not been given. The court of appeals reasoned that an arrest, by itself, is governmental action which implicitly induces a defendant to remain silent. In *Fletcher,* the Court rejected such a broadening of *Doyle* stating that "[i]n the absence of the

sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to post-arrest silence when a defendant chooses to take the stand." *Id.* 455 U.S. at 607, 102 S.Ct. at 1312. Thus, it is the affirmative assurance, implicit in the giving of *Miranda* warnings, that one's silence will not be used against him that triggers the protections of the due process clause when the government attempts to inquire into a defendant's silence. *See Anderson v. Charles,* 447 U.S. 404, 407–08, 100 S.Ct. 2180, 2181–2182, 65 L.Ed.2d 222 (1980). No such assurances are conveyed by the mere institution of a criminal investigation. Therefore, we reject Greene's attempted extension of *Doyle* to the present case.

### VI

■ Greene's additional arguments can be disposed of summarily. Greene claims prejudice resulting from the district court's denial of his motion for a continuance. Specifically, he argues that the government failed to provide meaningful discovery until five days before the initial trial date and, therefore, he was not allowed adequate time to analyze the government's documentation. We need not decide whether it was an abuse of discretion for the district judge to deny Greene's motion for a continuance. Greene's counsel stated at the hearing for the continuance that he needed an additional two weeks. Because of the subsequent interlocutory appeal of the denial of Greene's selective prosecution claim, the trial did not commence until more than four weeks after the original trial date. Because Greene ultimately received two weeks longer to prepare than his counsel had requested, his claim of prejudice is frivolous.

■ Next Greene claims that the district judge improperly commented on the foreign bank records and improperly chastised McNaughton in front of the jury for his presence during the opening statements. He argues that the judge's comments deprived him of a fair trial. Although a trial judge must always avoid the appearance of advocacy or partiality, *Rogers v. United States,* 609 F.2d 1315, 1318 (9th Cir.1979);

*United States v. Eldred,* 588 F.2d 746, 749 (9th Cir.1978) (per curiam), federal judges are granted broad discretion in supervising trials. *Rogers v. United States, supra,* 609 F.2d at 1318. *See also United States v. McDonald,* 576 F.2d 1350, 1358 (9th Cir.), *cert. denied,* 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978). Upon reviewing the record, we find that the district judge's remarks do not represent an abuse of discretion. Greene did not object to the judge's comments concerning the late introduction of the foreign bank records and, in addition, it appears that these comments merely raised to the jury the issue of credibility. The judge did not state that the evidence was not credible, but rather explained to the jury that the records had not been timely produced and that the jury could take this into account when it assessed their credibility. Similarly, Greene's counsel did not object when the judge chastised McNaughton for being present during Greene's counsel's opening statement or when the judge cautioned the jury that as a result, McNaughton might be influenced to alter his testimony to coincide with the facts Greene's counsel stated he expected to prove. At the same time the judge gave this admonition to the jury, he scolded the government attorney for not objecting immediately upon learning of McNaughton's presence in the courtroom during the opening statement. Additionally, the judge informed the jury that there would have been nothing wrong with Greene's counsel explaining to McNaughton outside of the courtroom everything that he was going to state in his opening argument. We conclude that the judge's comments concerning this episode did not deny Greene a fair trial and were within his broad discretion.

■ Finally, Greene claims the district court erroneously allowed the introduction of hearsay testimony. Greene points to testimony of Agent Stephens relating primarily to conversations he had had with individuals during his investigation. Much of the testimony to which Greene objects was stricken by the district judge. As to the remaining disputed testimony, which we will assume is hearsay, Greene does not argue, nor could he, that its admission assumes constitutional proportions. *See Dutton v. Evans,* 400 U.S. 74, 87–90, 91 S.Ct. 210, 219–220, 27 L.Ed.2d 213 (1970); *United States v. Snow,* 521 F.2d 730 (9th Cir.), *cert. denied,* 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976). Because the introduction of Stephens's statements could amount only to a violation of an evidentiary rule, we consider their prejudicial impact under the standard of Fed.R.Crim.P. 52(a) and reverse only if the error affected "substantial rights." *United States v. Castillo,* 615 F.2d 878, 883 (9th Cir.1980). After reviewing the record, we conclude that the introduction of the challenged statements was more probably than not harmless. *Id.; United States v. Valle-Valdez,* 554 F.2d 911, 916 (9th Cir.1977).

AFFIRMED.

FLETCHER, Circuit Judge, concurring:

I concur in the result. I further concur in all parts of the opinion of the majority, except Part V, with which I agree as to result only. I write separately simply to emphasize what the record and facts of the case before us do and do not permit us to decide this day with regard to the propriety of the use of pretrial silence to impeach a defendant who takes the stand in his own defense.

In Part V of the opinion, the majority concludes that in the "absence of the sort of affirmative assurances embodied in the *Miranda* warnings," *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), cross-examination of the defendant as to prior silence does not violate the due process clause of the Fifth Amendment. The majority states that "[t]he record does not indicate, nor does Greene argue, that he received *Miranda* warnings." Maj. op. at 1374. The record, in fact, fails to indicate that Greene received any affirmative governmental assurances whatsoever, either *Miranda* warnings or some other variety of governmental promises or representations conveying the sort of affirmative assurances that are embodied in the *Miranda* warnings. Faced with this record, the most that we can hold is that we have no basis to reverse for an alleged violation of due process. We do not today, indeed cannot, reach

the question of whether communications such as literature prepared by, verbal explanations by, or correspondence from governmental agents that explicitly or implicitly promise protection for silence, similar to *Miranda* warnings, may constitute the affirmative assurances that prevent cross-examination of the defendant as to silence accompanying or following such assurances.

Not only does the barren record before us prevent us from concluding that cross-examination of the defendant as to his prior silence was improper because it accompanied his receipt of governmental assurances, but it also prevents us from determining whether the circumstances surrounding the defendant's silence, even in the absence of governmental assurances, make admission of evidence of the silence a violation of federal evidentiary rules.[1]

Under the doctrine of *United States v. Hale,* a district court abuses its discretion in refusing to exclude cross-examination as to prior silence whenever the silence is not "sufficiently probative of an inconsistency with [the defendant's] in-court testimony to warrant admission of evidence" of the silence.[2] 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975); *see Jenkins,* 447 U.S. 231, 239, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86 (1980); *Doyle v. Ohio,* 426 U.S. 610, 617 n. 8, 96 S.Ct. 2240, 2244 n. 8, 49 L.Ed.2d 91 (1976).

Despite the importance of excluding the often prejudicial, rarely probative evidence

---

1. In *Jenkins v. Anderson,* 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), a case relied on heavily by the majority, the court stated quite emphatically that where the issue is raised a federal court properly exercising its authority must test the admissibility of prior silence to impeach in-court testimony of a defendant under both constitutional *and* evidentiary standards. As the *Jenkins* court carefully explained, "[e]ach jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative." 447 U.S. at 239, 100 S.Ct. at 2129. Consequently, while a state court decision to permit use of silence can be reviewed only for alleged constitutional error, since that decision is otherwise solely "a question of state evidentiary law," *Jenkins,* 447 U.S. at 239 n. 5, 100 S.Ct. at 2130 n. 5, we must review the decision to allow the use of silence in a federal criminal proceeding under both constitutional guidelines *and* federal evidentiary rules, since the "relevance of such silence, of course, would be a matter of federal law," *id.* In the exercise of our supervisory authority over the lower federal courts, we must reverse where the trial judge abuses his discretion in finding that the probative value of the defendant's silence outweighed any prejudicial impact, even if no constitutional violation is implicated.

In making such a determination under federal evidentiary rules, we must not lose sight of the fact that such Supreme Court cases as *Fletcher* and *Jenkins* that originated in state court trials merely sanction the use of prior silence for impeachment purposes where the silence has been duly held admissible under state evidentiary rules by the highest court of the state. They shed no light on the admissibility of silence in a *federal* court under *federal* evidentiary rules.

2. The *Hale* case itself makes clear that "[i]n most circumstances silence is so ambiguous that it is of little probative force." 422 U.S. at 176, 95 S.Ct. at 2136. A failure to state a fact on one occasion is probative of the credibility of a later statement *only if* offering an explanation, rather than silence, would have been the only "natural" human response. *Id.; see Jenkins,* 447 U.S. at 239, 100 S.Ct. at 2129.

Under the principles of *Hale* and *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), federal evidentiary rules prevent impeachment of an exculpatory story by prior silence where an explanation for the silence, other than lack of an exculpatory story, is possible. *Hale* holds that where the defendant is "particularly aware of his right to remain silent and the fact that anything he said could be used against him," speaking—rather than remaining silent—was *not* the only natural response under the circumstances. 422 U.S. at 177, 95 S.Ct. at 2137. Hence, the prior silence is inadmissible since the prior silence is simply not sufficiently probative of the credibility of the defendant's later testimony. *Id.* at 177, 180, 95 S.Ct. at 2137, 2138. Similarly, *Grunewald* holds that where a defendant, appearing before a grand jury, fears that he is "being asked questions for the very purpose of providing evidence against himself" and has no assistance of counsel or opportunity for cross-examination to bring out "exculpatory circumstances," speaking is not the only natural response. 353 U.S. at 423, 77 S.Ct. at 983. The silence is thus not sufficiently probative to justify its admission under federal evidentiary rules. 353 U.S. at 424, 77 S.Ct. at 984. *See also Stewart v. U.S.,* 366 U.S. 1 at 6–7, 81 S.Ct. 941 at 943–944, 6 L.Ed.2d 84 (silence inadmissible where not necessarily inconsistent with later testimony).

While the *Hale* defendant had been given *Miranda* warnings prior to his silence, the con-

of silence to ensure a fair trial, *Hale,* 422 U.S. at 180, 95 S.Ct. at 2138, the record below is devoid of any objection based on federal evidentiary rules to the government's comment on defendant's silence.[3] Nor does defendant raise a nonconstitutional federal evidentiary argument on this appeal. Thus, the trial court had no opportunity to exercise its discretion to evaluate the possible reasons for such silence and to decide on its admissibility, and we have no opportunity to review a challenge to such a discretionary decision had it been made on this appeal. *See* Fed.R.Crim.P. 52(b).

clusion that speaking rather than silence was not the only "natural" response under the circumstances rested *not* on the government's giving of assurances *per se* but on the likelihood that, because of those assurances, the defendant's silence was for reasons other than lack of an exculpatory story. The government must establish as a threshold matter an inconsistency between the prior silence and the later exculpatory testimony offered at trial before proof of silence may be admitted. 422 U.S. at 176, 95 S.Ct. at 2136. Since in *Hale* the possibility of the defendant's reliance on the right to remain silent prevented a finding of necessary inconsistency, the proof of silence in *Hale* "lacked any significant probative value" and had to be excluded. 422 U.S. at 180, 95 S.Ct. at 2138. Hence, *Hale* reasonably supports the principle that, regardless of whether *Miranda* warnings were given, federal evidentiary rules preclude proof of prior silence where the circumstances viewed in totality do not support a finding that a defendant was silent on a previous occasion solely because he had no exculpatory statement to put forward at the time of the silence. The silence is simply insufficiently probative, when weighed against its prejudice, to be admitted under the federal evidentiary rules.

This conclusion is bolstered by the discussion in *Hale* of various factors apart from a lack of an exculpatory story that could cause a defendant to be silent, including confusion, fear, a desire to protect others, and emotional hostility. 422 U.S. at 177, 95 S.Ct. at 2137. If the *Hale* court had intended that the determination of the probative value of silence—and hence the propriety of admission of proof of silence under the federal evidentiary rules—were to rest solely on the absence or presence of

government-given *Miranda* warnings before the silence took place, the court would have had no occasion to discuss the other factors. *See Doyle,* 426 U.S. at 617 n. 8, 96 S.Ct. at 2244 n. 8 (discussing *Hale*); *cf. Grunewald,* 353 U.S. at 424, 77 S.Ct. at 984 (prior silence is inadmissible even where *Miranda* warnings have not been given where the circumstances show that the silence lacks significant probative value); *Stewart,* 366 U.S. at 6–7, 81 S.Ct. at 943–944 (same).

3. Since the defendant is the one seeking to suppress evidence of prior silence, it is his obligation to object to the government's attempt to introduce such evidence. However, once the objection has been raised, under the federal rules of evidence, the government has the burden to establish the probative value of prior silence. *Hale,* 422 U.S. at 176, 95 S.Ct. at 2136 ("If the *Government fails to establish* a threshold inconsistency between silence … and later exculpatory testimony at trial, proof of silence lacks any significant probative value and must therefore be excluded.") (emphasis added).

Greene's counsel at one point did object to cross-examination of the defendant as to his attorney's silence at an IRS conference on the ground of "relevancy." After the prosecutor asserted that such prior silence was relevant since it showed the Liechtenstein bank account defense had not been raised until after trial had begun, Greene's counsel did not renew an objection based on nonconstitutional federal evidentiary rules but rather objected, albeit erroneously, solely on the ground that the constitution absolutely barred introduction of such evidence.